JOHN CALLAHAN *et al.*, Plaintiffs-Appellants, *v.* HOMER RICKEY *et al.*, Defendants-Appellees.

Third District    No. 80-254

Opinion filed March 9, 1981.

Bernard C. Gillman and Dorothea O'Dean, both of Rock Island, for appellants.

Isador I. Katz and Frank R. Edwards, both of Katz, McAndrews, Durkee & Telleen, of Rock Island, for appellees.

Mr. JUSTICE ALLOY delivered the opinion of the court:

The plaintiffs in this cause are owners or tenants of agricultural land in southwestern Mercer County. The defendants are owners of farm land in the same vicinity. All of the plaintiffs' land lies generally west of the defendants' land. Two parcels, the "Callahan farm" and the "O'Malley farm" abut the western edge of defendants' land. The rest of the plaintiffs' lands lie to the north, south, and west of the "Callahan" and "O'Malley" farms.

On June 10, 1974, the plaintiffs filed a complaint, later amended, charging the defendants with unlawfully changing the contours of defendants' land so as to cause excess water to run onto and damage the property

of the plaintiffs. The plaintiffs sought damages and mandatory injunctive relief. The Rickeys counterclaimed, alleging that the plaintiffs had illegally changed the contours of the plaintiffs' land, thereby interfering with the natural drainage of water away from the Rickeys' land. The Rickeys also sought damages and mandatory injunctive relief.

In July of 1977, a bench trial on the merits was held. On April 25, 1980, the court entered judgment against the plaintiffs on their complaint and against the Rickeys on their counterclaim. The court found that neither set of parties had proved its respective claim by a preponderance of the evidence. Only the plaintiffs now appeal.

The plaintiffs complain that they were damaged in the years 1973 and 1974 by water running off a 90-acre piece of land in the southwest of defendant's farm. The allegedly offending property is divided into two fields, a 42-acre field on the east and a 48-acre field on the west. The two fields abut, but are separated by a hedgerow and wire fence. The hedgerow is slightly higher than either adjoining field, although it slopes toward the north. All of the parties' property lies on low land near the Mississippi River. All of it lies to the southwest of a bluff.

The bluff drains about 1000 acres, sending its excess water onto the lands of the parties. The lands of the parties drain generally to the south. However, these lands are rather flat, so that small changes in contour produce local deviations in the general north to south drainage pattern.

Two north-south drainage ditches run past the defendants' "offending" 90 acres. One of these ditches lies on Rickey property to the east of the 90-acre parcel. It runs through what has been called at the trial, the "pasture" land. The other ditch is located on the "O'Malley farm", farmed by some of the plaintiffs. The "O'Malley" ditch lies some 300 feet to the west of the 90-acre parcel. The west edge of the 90-acre parcel forms a part of the boundary between the Rickey and O'Malley farms. Generally, the east 42 acres of the 90-acre parcel drains to the southeast and the west 48 acres drains to the southwest. This drainage pattern is evident on aerial photographs taken as early as 1950. Defendant Homer Rickey, along with his son, farms the Rickey farm. The east 42-acre field is plowed in such a manner that a "dead furrow" is created running from the northwest to the southeast of the field. This facilitates drainage toward the ditch located to the east of the field, in the Rickey "pasture" land. In 1967, the defendants employed mechanical equipment to install a grass waterway in the western 48-acre field. The grass waterway served to facilitate drainage to the southwest, toward the "O'Malley" ditch, while preserving the Rickey land from excess erosion.

The defendants' expert, a qualified civil engineer, testified that drainage to the south, through the Rickey "pasture" ditch, had been partially interfered with by the construction of a county highway two

miles to the south of the defendants' land. The plaintiffs allege that the defendants, in order to facilitate drainage of their east field, have artificially cut through the hedgerow, so that the east field, as well as the west, drains into the "O'Malley" ditch. In addition, they allege that the grass watercourse is an unlawful alteration, which causes still more water to drain into the "O'Malley" ditch. Prior to 1973, the plaintiffs suffered no ill effects from, and made no complaints about, the defendants' drainage pattern. The springs of 1973 and 1974 were periods of unusually heavy rains. In April of 1973, 9.52 inches of rain fell at the recording station nearest the parties' farms. This was 6.61 inches in excess of normal. May precipitation was 3.8 inches above normal, and total precipitation for the year was 27.52 inches above normal. In 1974, 8.09 inches of rain fell in May, 4.7 inches above normal. Total precipitation for that year was 9.98 inches above normal.

The plaintiffs' lands drain into the "O'Malley" ditch. In 1973 and 1974, the plaintiffs' land suffered considerable flooding. The plaintiffs attribute this flooding to a failure of the "O'Malley" ditch to carry excess water away from their fields. They attribute this failure to the increased load placed upon the ditch by the "improper" diversion of water from defendants' land into the ditch.

The defendants acknowledge that they removed, by the roots, some small (1 to 3 inches in diameter) trees that they had previously allowed to grow at the north end of the hedgerow. In so doing, they admit, some dirt was removed. However, they deny purposefully constructing a ditch through the hedgerow so that water backing up in their east field could drain through the west field. The defendants claim that water has always run both ways through the north end of the hedgerow, the variable most affecting the direction of flow being the level of the water itself. There is clearly a depression at the north end of the hedgerow. It is covered with vegetation and demonstrates no visible signs of being artificial. The defendants' own expert acknowledges, however, that after a few years, an artificial ditch may no longer appear artificial.

The court found that:

> "The evidence as to whether or not defendants actually made a 'ditch' or opening between his fields is controverted. The evidence as to how much water may have been diverted by anything done by defendants is highly speculative. The evidence as to what damages may have been suffered as a result of any 'unlawful' acts performed by the defendants is highly speculative."

Therefore, the court concluded that the plaintiffs had not proved their case by a preponderance of the evidence.

The plaintiffs' first assertion on appeal is that the judgment of the court is contrary to the manifest weight of the evidence.

■■ The owner of a dominant estate does not have "an unlimited right to increase the rate or amount of surface-water runoff flowing onto" the land of a servient estate. "Interference with natural drainage has been limited to that which is incidental to the reasonable development of the dominant estate for agricultural purposes." (*Templeton v. Huss* (1974), 57 Ill. 2d 134, 141, 311 N.E.2d 141.) The record in this cause supports a conclusion that both the grass waterway in the west field, and the dead furrow in the east were permissible modifications to the land under the "good husbandry" rule, enunciated above. The court noted that "dead furrowing" was an inevitable part of plowing, and the evidence indicates that the direction of the dead furrowing was consistent with the natural contours of the land, merely facilitating the flow of water into the ditch on the defendants' own pasture land. Similarly, the grass waterway ran in the same general direction that water had previously flowed, at least from the early 1950's, as evidenced by the aerial photographs, *i.e.*, toward the "O'Malley" ditch. The grass waterway served to reduce erosion of the defendants' land. Between the 1967 and 1973, no complaints were made by the servient landholders about the waterway. We cannot, therefore, say that either the grass waterway or the dead furrow was an "interference with natural drainage" not "limited to that which is incidental to the reasonable development of the dominant estate for agricultural purposes."

■■ ■ Regarding the alleged "ditching" across the hedge line, the trial court found the evidence to be contradictory and inconclusive. Although a trial court's holding is always subject to review, this court will not disturb a trial court's finding and substitute its own opinion unless the holding of the trial court is manifestly against the weight of the evidence. Underlying this rule is the recognition that, especially where the testimony is contradictory, the trial judge as the trier of fact is in a position superior to a court of review to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof. (*Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 226 N.E.2d 624; *Ehrhart v. Reid* (1979), 73 Ill. App. 3d 824, 828-29, 392 N.E.2d 435.) From our review of the evidence in the record, it is apparent that the judgment of the trial court is adequately supported in the record and that his determination is clearly not contrary to the manifest weight of the evidence in this cause.

The plaintiffs next contend that the court erred in finding that the plaintiffs had failed to prove their damages by a preponderance of the evidence. The plaintiffs testified as to the amount of land each of them lost to production in the years 1973 and 1974. They each testified as to the crops they had intended to plant thereon, the market value of these crops, and the cost of their production. All of this evidence was properly before the court on the issues of damages. Also before the court was evidence

that all of the land below the bluff, including that of plaintiffs and defendants, was subject to flooding, that the rainfall in 1973 and 1974 far exceeded the norm, and that the plaintiffs suffered less flooding in 1975 than in 1974, and virtually no flooding in 1976. The issues of damages and of causation in this cause were intimately connected. The court found that the evidence was highly speculative as to the extent to which the flooding of plaintiffs' land was proximately caused by the activity of the defendants. As a result, the amount of damages attributable to the defendants' activities, be they "lawful" or "unlawful," was highly speculative. The evidence in the record supports the court's findings.

For the reasons stated, the judgment of the Circuit Court of Mercer County is hereby affirmed.

Affirmed.

SCOTT, P. J., and HEIPLE, J., concur.