No. 3--06--0767

Filed April 23, 2008

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2008

| | | |
|---|---|---|
| FRANCIS HALPIN, SCOTT HALPIN, and THE ESTATE OF MERVILLE T. CHRISTENSEN, By and Through its Executor, Rodger Christensen, | ) ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit Grundy County, Illinois |
| Plaintiffs-Appellees, | ) ) ) | |
| v. | ) ) ) | No. 05--MR--10 |
| PETER SCHULTZ | ) ) | |
| Defendant-Appellant | ) ) ) | |
| (James Schultz, and Unknown Owners of Record, | ) ) ) ) | Honorable Robert C. Marsaglia |
| Defendants). | ) | Judge, Presiding |

JUSTICE WRIGHT delivered the opinion of the court:

Defendant, Peter Schultz (hereinafter referred to as defendant), appeals from an order of the Grundy County circuit court allowing plaintiffs, Francis Halpin, Scott Halpin, and the estate of Merville T. Christensen, by and through its executor, Rodger Christensen, to "replace and maintain" agricultural tile on defendant's farmland without his permission. After carefully reviewing the record, we vacate the circuit court's order.

BACKGROUND

On April 26, 2005, plaintiffs filed a two-count complaint in the Grundy County circuit court alleging that defendants prevented them from exercising their statutory right to drain water through defendants' land. In count I, plaintiffs requested the court to grant a declaratory judgment "finding the natural flow of water from plaintiffs' property is over and through the property of the defendants," and declaring plaintiffs possessed a continuous right to drain water from their property through defendants' property. In the same count, plaintiffs requested the court to grant them the right of access to defendants' land to replace and repair drainage tile. Plaintiffs also requested an order prohibiting defendants' interference with these "rights to naturally drain said water, repair the tile or to replace the tile." In count II, plaintiffs sought monetary damages for any crop loss caused by defendants' refusal to allow plaintiffs permission to enter his land to repair or alter the drainage system.

The complaint named neighbors, James and Peter Schultz, and "Unknown Owners of Record" as defendants. Peter Schultz (defendant) appeared personally and challenged the action *pro se*. Defendant's nephew, James or Jimmy Schultz, was served with summons and consented to allow access to his 37 acres, which lie between Peter's property and his brother James's three acres. Defendant's brother James was not personally served or named in the court's final order.[1] Nephew James Schultz has not appealed.

Plaintiffs subsequently filed a motion for summary judgment, which the court denied. Included in the order denying summary judgment, the trial judge allowed plaintiffs to enter defendant's property "for the purpose of determining topography and

---

[1]The complaint does not reveal whether defendant's brother was the intended defendant. Regardless, neither James Schultz has joined this appeal.

2

find[ing] existing tiles." The court ordered the inspection to occur no later than January 15, 2006, and required a prerequisite 24 hours' notice to defendant before entry on his property. The court specifically ordered plaintiffs to secure a liability insurance policy for at least $1 million prior to entry.

Plaintiffs entered defendant's property on two occasions. On January 14 or 15, 2006, Richard Wepprecht (Wepprecht), a farm drainage contractor, probed the property to determine the presence and direction of defendant's drainage tiles. On February 7, 2006, Wepprecht and his son returned to defendant's land with a backhoe and truck. This time, a marked squad car and uniformed officer stood by while Wepprecht used the back hoe to remove between 14 and 42 inches of frozen cover soil in order to expose and examine the condition of defendant's drainage tiles. Wepprecht photographed the excavation for future court proceedings.

The matter proceeded to trial on May 26, 2006. As a preliminary matter, defendant requested that the court bar plaintiffs from introducing evidence gathered during their second inspection and excavation of his property. In his opening remarks, defendant informed the judge that plaintiffs gathered evidence from his property on February 7, 2006, a date that was beyond the court's January 15 deadline for plaintiffs to enter defendants property, to locate the tile and measure elevations. Defendant also advised the judge that the entry occurred without 24-hour notice to him and, therefore, he was not present to witness the procedures. In response, the court advised defendant that if he suffered any damage to his property, he would "need to bring an action. The motion (to bar) will be denied."

3

Plaintiffs opened their case by calling one of the plaintiffs, Rodger M. Christensen (Rodger), the executor of the Merville T. Christensen estate, who testified to the history of the land. He stated his 28-acre parcel was originally part of an approximately 100-acre parcel previously owned by the Christensen family and annexed to the city of South Wilmington in September of 1993. In 1994, the family sold a 16.85-acre strip of land, which was developed into a 16-lot subdivision with all lots abutting Coster Road, with plans to expand the subdivision to 80 lots. The subdivision had a separate water main system, a sanitary sewer system, and was divided from north to south by Lake Street, which runs perpendicular to Coster Road. The family retained approximately 28 acres and constructed a two-acre pond on that property, and sold the other 65 acres on the western side of their property to "the Halpin brothers." Rodger described an instance in 1966 when he personally observed water from the entire 100-acre parcel draining to the northeast over the Schultz brothers' land and watched crop debris washing across the land in that direction. Rodger testified that the original 100-acre parcel contained drainage tile which he personally repaired on five or six occasions during the 1960s and 1970s. Rodger was not aware of any modifications to the property that altered the natural flow of water from the time he made these observations in 1966.

Approximately two years before trial, Rodger spoke to defendant, Peter Schultz, about a small east-west ditch or swale located along the south edge of defendant's property along Rodger's north property line. During their discussion, defendant advised Rodger that defendant planned to eliminate the ditch by turning it into cropland.

According to Rodger, he remembered that when the ditch existed, it "took" some

4

drainage water but "it wasn't a high percentage." After entering the swale, Rodger stated the water traveled eastward into a ditch along Coster Road. After entering that ditch, the runoff traveled to the north. Rodger agreed the swale was located entirely on defendant's property. Rodger also agreed his family constructed a pond on their remaining land, complete with a duck blind, and that the Halpins dug a second duck blind on their 65 acres.

Rodger explained the purpose of the duck pond was to "hold back" water during heavy rains to protect lower landowners from excessive flooding as part of a conservation reserve program (CRP) administered by the United States Department of Agriculture (USDA). Rodger further explained the pond was designed with seepage tiles to help landowners to the north by "giving them less water." Rodger stated the pond did not alter the general course of natural drainage from the south to the northeast.

The plaintiffs' second witness at trial was Guy Richard Christensen, unrelated to the plaintiff, an engineer for Chamlin & Associates in Morris, Illinois. Guy testified that he was present in defendant's field when the elevation measurements and excavation occurred. Wepprecht located tiles starting at a point near the boundary line between defendant's land and Christensen's property toward the north-northeast through defendant's land, but he noted the actual discharge point for these drainage tiles was not located. Guy explained he could not identify an exit point for the tile because, "It was not determined by Mr. Wepprecht which – there's several tiles that outlet at the ditch on the northeast corner of the Schultzs' property at that intersection of the roadway. It was not determined which of those was the outlet tile for this existing tile that we shot

5

elevations of."

The measurements of five elevations were from south to northeast, as follows: 585.77 feet, 585.12 feet, 584.73 feet, 584.15 feet, and 583.78 feet. Responding to questions from the judge later in his testimony, Guy explained that the two-foot fall in elevation on Peter's and James Schultz's property was sufficient to allow water to flow nicely with respect to field tile drainage. He concluded that the tile on defendant's land was carrying water "to the northeast from the Christensen property across the respective Schultz' property," and that the "natural flow of water" was to "the northeast."

Plaintiff's exhibit No. 7 is a survey map depicting the land and defendant's field tile described by Guy. On the map, notations marked certain locations with 8-inch tile and others with 10-inch tile. The existing tile is shown proceeding north and slightly east through defendant's land, and then straight north through James Schultz' land in the Coster Road ditch. The diagram does not show a discharge point.

Exhibit 7 also displays an "alternate" location for a entirely new line of drainage tile to be constructed across defendant's land running directly to the north and discharging on Main Road. The "alternate field tile location" discharges into an "existing ditch" along Main Road.

The next witness to testify was Richard R. Wepprecht, a professional farm drainage contractor with over 30 years of experience. Wepprecht testified that the first time he was on defendant's property, he located field tiles running from the Christensen land northeast into defendant's land, and then running northward through Peter's and James Schultz' land. Wepprecht testified that he started his first probe and located field

6

tile at the northernmost point of exhibit No. 8 on James Schultz's property. He worked southward from there locating six locations where he located and performed a "dig" to verify that a field tile was located there and to verify the condition and direction of the tile. These were specifically identified in plaintiff's exhibit No. 8. He used approximately 30 flags to mark the route of the tile.

On February 7, Wepprecht returned with a backhoe and performed some excavation to visually inspect the buried tile and take photographs to prepare for trial. He used a backhoe because the ground was frozen. The excavation occurred at six different locations. According to Wepprecht, he dug down 42 inches and found a 10-inch clay tile on James Schultz' land with one inch of sediment and 3½ inches of water inside at dig No.1, the dig closest to the northern end of the Schultz' property border. The water was running slowly toward the north at this point. Wepprecht agreed he installed a new plastic corrugated tile at this location on February 7 because he broke the existing clay tile with his digging. When asked why he did not follow the tile to its discharge point on Coster Road, Wepprecht said, "[b]ecause I think we were supposed to not get into that homeowner's property down in their lawn."

In Wepprecht's professional opinion, the drainage tiles should all be replaced with a larger 12-inch plastic corrugated tile. The reason for use of plastic tile was that clay tile corrodes, is no longer manufactured, and, unlike smooth clay tile, creates friction that slows the movement of water. Wepprecht opined that a 12-inch tile would properly address the drainage needs of plaintiffs' land and also improve the drainage of Peter's and James Schultz' land.

7

The next witness was plaintiff Frances E. Halpin, Jr., who identified his land as lying west of the Christensens' land and south of defendant's land. Following Halpin's testimony, plaintiffs moved to admit several exhibits. Defendant objected to Plaintiff's exhibits Nos. 3, 4, 5, 6, and 7, and nine photographs consisting of plaintiff's exhibit No. 8, renewing his objection to the exhibits on grounds that the exhibits depicted information gathered on February 7, beyond plaintiff's court-ordered authorization to be present on defendant's land. The court allowed admission of these exhibits over defendant's objection.

Defendant was the next witness in the proceeding and testified that water on the Christensen land always flowed eastward to the ditch along Coster Road, and then northward through the ditch, prior to the construction of the subdivision. Defendant opined that the natural flow of water on the farmland had changed since the development of the subdivision and the CRP programs. He also testified that there was a divisional line, where Lake Street intersected with the subdivision, where water flowed in a northerly direction north of the line and a southerly direction south of that line.

According to defendant, plaintiffs' field tiles never connected with tiles on his land. He described a swale, created many years earlier between the Christensen and Schultz properties, where Christensen's field tiles deposited water and defendant's drainage tiles deposited water. The water ran eastward on the surface and discharged into a ditch along Coster Road. Defendant noted plans for additional development on the Christensen land and complained that those plans would cause further change in the natural course of drainage, sending even more water northward onto his land instead of

8

eastward through the subdivision lawns and into the Coster Road ditch. Defendant explained that there currently is an existing steel tile where this drainage to the east exited.

Defendant described damage to his electrical cords and field that was caused by the backhoe used on February 7, 2006. He emphasized that he was not afforded the 24-hour notice of the inspection, or of any excavation, and he did not receive a copy of the liability insurance policy the court ordered. Defendant stated the backhoe muddied up his property and damaged the existing tiles. Later in the proceeding, he expressed concerns that, if the court allowed Wepprecht to return to his farm with heavy equipment to replace one line of tile, the weight of Wepprecht's equipment would collapse other tiles on his well-tiled farmland. He stressed that the clay tiles should be repaired by hand to prevent further damage to the existing tiles. He described how 15 acres of his 2006 crops were adversely affected by flooding caused by the backhoe damage, and he was worried about further damages resulting from ripping up all of the tiles and replacing them with larger ones.

Defendant reminded the judge that plaintiffs wanted to change the size and direction of the drainage tile which, he claimed, "the Illinois law – drainage law does not even permit." Defendant also testified that the tiles on his property "nowhere at all empty into a ditch." He stated his field tiles have no direct connection to the Halpin farm or the Christensen property. He believed his tiles join with his nephew's 37 acres to the north and then travel into his brother's 3 acres beyond his nephews land. He emphasized that no one has examined his brother's field.

9

Defendant also testified to prior conversations with his neighbors; stating Rodger approached him one day, shook his hand, and apologized for a misunderstanding regarding the grassy swale. According to defendant, Rodger told him the swale belonged to defendant and he had the right to plow it up. Defendant also stated Frank Halpin stopped by his property one day and told him "he was going to tie tiles onto my property. There was no asking, no nothing. He was just telling me what he was going to do. I basically told Mr. Halpin to leave my property."

Defendant noted that on February 7, 2007, the Grundy County sheriff provided a squad car with flashing lights to stand by on his property while the backhoe and truck traveled on his land. Defendant stated that a deputy informed him that there was a court order requiring him to allow the inspection of his land. When he asked to see the order, the deputy refused.

The judge overruled a relevancy objection, stating the violation of a court order was "relevant" because the order required 24-hour notice. The court stated, "As an evidentiary matter, if you went out and dug and didn't give him 24 hours notice so he would have a right to be there to see what was going on, that's a problem, but that's a different – that's a credibility problem."

Upon inquiry by the court, defendant explained the natural flow of the Christensen's water was northeastward across the Christensen land to the grassy swale, east to the ditch, then breaking to the north and south at Lake Street. Again, in response to the court's question, defendant explained his farm is a well-tiled farm. He emphasized that his tiles have never joined with the tiles on the property that belonged to the original

10

Christensen parcel.

Defendant acknowledged that he did not dig any holes to discover if plaintiffs' land contained tiles running east to west. He stated he did not have the right to go on the Christensen property. He did not dig down to discover if there was a tile joining Halpin's land by drainage tile to his own drainage system.

Regarding tiles that discharged water north of his land onto Main Road, he noted those tiles might come from his brother's farm. He had seen these tiles discharging water, but he testified that he did not know whether the water discharged through any tiles on either Coster Road or Main Road came "out of" his property.

Plaintiff's counsel called Rodger Christensen in rebuttal. Rodger described that, as part of the CRP program, the government compensated him for installing seepage tiles and building the duck pond to slow water down. According to Rodger, the seepage tiles were installed "entirely on our property. The seeping tile was placed so that it would go into the pond. I did not change the flow. It was naturally there." During cross-examination by defendant, Rodger denied the backhoe was used to move a tile that changed the direction of the natural flow from east to a pattern of water flow to the northeast on to defendant's land.

During closing arguments, the judge interrupted plaintiffs' counsel and stated: "Mr. Rigazio and Mr. Schultz, here I think is what we're talking about, 605/2-5. 'If on the trial of the case,' which we've now completed, 'it is found that the proposed drain will be of ample capacity, will not materially damage the land of the defendant,' that's Mr. Schultz, 'and will empty into a) a natural water course,

11

b) the highway authority, or c) any other outlet which the plaintiff has the right to use; then the finding or verdict shall be for the plaintiff, and the defendant shall be allowed such actual damages only as will be sustained by entering upon the land and construction of the drain thereof after keeping the same in repair.' All right. So what we're talking about here is proposed drain will be of ample capacity, so what we're talking about now is eight ample capacity or do you have to have 12 to have ample capacity. And let's just all emphasize that we're not talking about making ample capacity for any future subdivision. We all agree with that."

Counsel for plaintiffs agreed.

During his own closing arguments, defendant said he wanted plaintiffs to run their tile eastward and stay off his land. He also reiterated his claim that no tile from plaintiffs' land tied into tile on his property.

Rodger's counsel responded that running a drainage tile to the east and avoiding the Schultz farm was not possible because the land was not pitched enough to carry the runoff to the drainage ditch to the north. Plaintiffs' counsel, attorney Belt, addressed the court, requesting that defendant be ordered to contribute to the cost of installation of the new, corrugated 12-inch drainage tile.

At the conclusion of arguments, the judge entered an order granting plaintiffs' request for a declaratory judgment. The order specifically stated:

"The natural flow of water is from Plaintiffs' property over and through defendants' property. Plaintiffs may continue to drain in that direction and may go onto defendants' property to replace and maintain the tile in existence. Plaintiffs

12

may install the 12-inch tile testified to by Wepprecht, but must pay damages, if any, in accordance with 605/2-6."

Plaintiffs filed a motion to reconsider, noting that the judge failed to address their request for an order compelling defendant to pay 66% of the replacement costs. They again requested such an order. The judge subsequently ruled as follows: "Plaintiffs' motion to reconsider is granted. The relief sought therein is denied." The instant appeal by defendant followed.

## ANALYSIS

This appeal involves two issues related to the application of the Illinois Drainage Code (Code)(70 ILCS 605/2-1 *et seq.* (West 2004)). First, whether the Code provides the authority for a property owner, situated on higher ground, to compel an adjoining agricultural land owner to allow the entry onto his land for use of his privately owned, covered drainage tiles against his wishes, for the private benefit of the upper property owner. Second, whether the circuit court's order complied with the dictates of the Code in this case.

Defendant writes in his *pro se* brief submitted to this court, "The tiles were never tied together." As his contention of error, defendant concludes that plaintiffs should not "be allowed to tie into my field tiles, since their field tiles never did." Again, in his reply brief he states, "Halpins' could never prove a tie in or an exit of their field tiles." Relying on the Code, counsel for plaintiff responds by framing the issue for our consideration as follows:

"Whether the court errored [*sic*] in giving Plaintiffs the right to enter onto

13

the property of Defendants for the purpose of erecting, replacing, or repairing tile***in accordance with 70 ILCS 605/1-1 *et al* [sic]."

The construction of a statute involves a question of law and is subject to *de novo* review. *Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 228 (2007). To that end, we have carefully examined the Drainage Code in its entirety, considered the issues defined by plaintiff's response to defendant's appeal, and examined only those facts admitted by defendant or introduced by the parties as evidence during the bench trial. The issues considered herein are those matters directly related to the construction of the Drainage Code, which plaintiff asserts provides his unconditional authority to construct drainage tiles on his neighbor's land without permission. We determine the trial judge improperly usurped defendant's right to refuse access to his private property by entering an order without making the requisite findings required by the Code.

A landowner's right to deny others permission to enter upon his land has been historically protected as a constitutional right, with very few exceptions. *People v. Sayer*, 246 Ill. 382 (1910). Our supreme court eloquently described this principle by stating:

"[A]ny [A]ct that would authorize a trespass by a private person, for his own purposes, upon lands owned by another, would be in conflict with the plainest provisions of the Constitution and fundamental rights of property." *Sayer*, 246 Ill. at 387.

The Illinois legislature has both recognized and protected the significant property rights of agricultural landowners by the enactment of the Drainage Code. The Code balances these important interests.

14

## 1. Use of Existing Drainage Tiles

Plaintiffs filed this action to compel his neighbor to allow plaintiffs access to defendant's land against defendant's wishes. Plaintiffs hoped the court would order defendant to allow plaintiffs to construct a larger covered field tile on defendant's land and then connect the larger tile with drainage tiles on plaintiffs' properties to drain their lands. Plaintiffs' complaint directed the court to section 2-1 of the Code. Section 2–1 states:

> "Land may be drained in the general course of natural drainage by either open or covered drains. When such a drain is entirely upon the land of the owner constructing the drain, he shall not be liable in damages therefor." 70 ILCS 605/2-1 (West 2004).

However, plaintiffs' proposed drainage was not contained entirely within their own property. Contrary to the position taken by the dissent, the language of section 2-1 does not create an inalienable right for dominant property owners to require their neighbors to repair existing tiles or allow the construction of new covered drains across their lands for the benefit of their dominant neighbors. The authority to extend a covered drain, the relief sought by plaintiffs, from higher land to lower land, is found in section 2-2 of the Code.

Section 2-2 of the Code, entitled "Extension of covered drain through land of others" (70 ILCS 605/2– 2 (West 2004)), is determinative. No matter how slight the decline in elevation, section 2-2 of the Code provides that a  property owner situated

15

above his neighbor, when necessary, may compel the neighbor with subservient land to accept water carried in a privately owned, covered drain from the higher ground to the covered drains in the lower ground, all in the course of natural drainage.

The trial judge described the topography of the area where the Christensen and Schultz farms were situated as so flat it resembled "a billiard table." The Christensen farm has an elevation change of approximately seven feet from the highest point to the boundary line at defendant's farm. Defendant's farm has even less slope than his neighbor's. Defendant's land has only a two-foot change in elevation.

Nonetheless, plaintiffs' land is situated higher than defendant's. Even assuming *arguendo*, the court correctly found the course of natural drainage was from plaintiffs' higher ground, over and through defendant's land, as the dissent concludes, the Code sets forth stringent requirements for additional findings that the circuit court ignored.

Plaintiffs would have us selectively ignore the plain language of portions of the entire Drainage Code that protect the property rights of subservient land owners in order to affirm the trial court's decision. From the onset, plaintiffs ignored segments of the Code, designed to protect defendant's significant private property interests which were at stake. It does not appear a statutory bond was ever considered to insure defendant would be paid for damages to his disturbed fields. 70 ILCS 605/2-3 (West 2004). Further, plaintiffs did not prepare or attach a map to the complaint, as required, showing at least the proposed discharge outlet for the drainage water beyond defendant's land. 70 ILCS 605/2-4 (West 2004). These omissions, pertaining to damages and the discharge

16

point, may have contributed to plaintiffs' failure to provide the necessary evidence that would have enabled the court to make the appropriate factual findings required by the Code.

Additionally, the Code required the court to consider whether the proposed covered drain was both necessary and would not materially damage the defendant's land and would empty into an acceptable discharge outlet. 70 ILCS 605/2-5 (West 2004). Further, if the release point for the discharge of the water was proposed to be along a public roadway, such as would occur in this case, the Code compelled the court to determine whether plaintiffs had obtained permission from the "highway authorities" for discharge. 70 ILCS 605/2-5 (West 2004). In essence, the Code requires, once the water arrives by covered drain in the lower property owner's tiles, that the covered drain must carry the upper neighbor's water to a discharge point beyond the lower property owner's fields.

Plaintiffs' exhibit 7, the topography map created by plaintiffs' engineer, Guy Christensen, conclusively established the discharge point or outlet was unknown. The exhibit includes this language,

> " DISCHARGE OF TILE WAS NOT LOCATED AND IS NOT SHOWN ON
> THIS DRAWING."

Plaintiffs' expert witness, Richard Wepprecht, whom the court found very credible and qualified, also testified that the outlet point for the tile had not been ascertained.

The trial judge seemed to recognize, but later ignored, this statutory requirement

17

to find that the proposed covered drain would have a finite discharge point, as demonstrated by this exchange after the close of evidence and during closing arguments,

"MR.SCHULTZ: *** are they saying they're going to exit off my property

into the ditch? I have no drain tiles that exit off my property into the ditch.

THE COURT: No, and no one has said you do. I don't think anyone has testified to that. Mr. Belt?

MR.BELT [plaintiff's counsel]: No, I don't believe so, your Honor.

THE COURT: Okay. And that is – but you're – I mean, but *that is an element they have to show.* I agree." (Emphasis added.)

The lack of a discharge point is a relevant consideration for our review since plaintiffs have requested that we rely on the Code as a basis to affirm the trial court's decision. The Code requires that the extended drainage must *carry* the water in the proposed covered tiles to a discharge point beyond the lower landowner's fields. Contrary to the trial court's ruling, the Code does not allow a covered drain to be constructed and extended to deposit stagnant water on a neighbor's land.

Not a single witness testified to the location of an outlet point where plaintiffs' water, carried in defendant's existing, private covered drain, would be discharged beyond defendant's property at either Coster Road or Main Road. The testimony of plaintiffs' expert witness, Wepprecht, established that a discharge point for the new proposed tile to

18

the northeast, after crossing defendant's land, could not and had not been determined.

Citing *Callahan v. Rickey,* 93 Ill. App. 3d 916 (1981), the dissent characterizes the trial judge's ruling as a fair resolution of contradictory evidence within the province of the trier of fact. We agree that the trial court was called upon to resolve the discrepancies in the facts as to natural course of the water flow. However, regarding the lack of a determination for a discharge point for the water naturally traveling across defendant's land, Wepprecht's testimony was undisputed. There was not any contradictory evidence regarding the discharge point for the trial judge to resolve. All witnesses agree, the discharge point was not located. We emphasize after making a factual determination of the natural course, the court was required to apply the Drainage Code to the facts and make additional specific findings.

The trial court's order did not find a discharge point or note the approval of the discharge location by the highway authorities. The statute specifically states, if these findings are not "so found," then the "finding *** shall be for the defendant." 70 ILCS 605/2-5 (West 2004). The language of the statute is unequivocal. Absent these findings, the Code required the circuit court's order "shall be for the defendant." It was not and, therein, lies the error.

Remand is unnecessary in this case. Not only did the circuit court fail to make the requisite findings, a careful review of the record demonstrates the trial court would not be able to make such findings, as required by the Code, based on the evidence in this case. The absence of evidence offered by plaintiffs to prove that a proposed discharge

19

point existed beyond defendant's land constitutes a critical factual omission requiring a reversal of the trial court's ruling.

## 2. Access for Repair or Construction

In this case, the court order reads, plaintiffs "may go onto defendants' property to replace and maintain the tile in existence." The order as written did not allow for the simple repair of a few old, broken, clay tiles. Here, plaintiffs' exhibit No. 7 contained two proposals for the extension of drainage tile across defendant's land. Both proposals required the construction of a completely new line of tile. The first proposal, directed towards Coster Road, would tear out the existing 8-inch and 10-inch clay tiles to facilitate the installation of a larger 12-inch tile. The second proposal would not involve demolition of the old tile, but instead would create a new "alternate" route for discharge directed towards Main Road, a line of drainage tile that does not currently exist on either of the Schultz properties. We conclude the term "replace" as employed by the trial court would allow for new construction.

During his testimony, and again in his reply brief, defendant expressed serious concerns over the potential damage to his family farm. He stated the heavy equipment would destroy most of his other clay tiles, would muddy up his land, and could reduce future crop yields. In error, the judge's order allows the construction to begin before assessing defendant's damages, contrary to section 2–6 of the Code. The installation of 12-inch tile at either the existing or the new location cannot begin under the authority of the Code before damages are paid to defendant.

The law does not favor the expropriation of private property for the public good without just compensation. Even less attractive is the expropriation of private property for the private benefit of an adjoining property owner. Yet this is precisely what the trial court allowed. The court allowed plaintiffs the use of the defendant's land for their private benefit without any compensation for either the use or the damage occasioned by access.

Much like the taking of private property rights for the public good under the principles of eminent domain, the Drainage Code restricts plaintiffs' access to defendant's land for the construction of extended drainage tiles until a point in time after damages and costs have been addressed. The code allows access without permission only:

> "after paying or depositing the damages awarded and paying the costs taxed against him, [plaintiff] may thereupon enter the premises of the defendant and construct the drain***" 70 ILCS 605/2-6 (West 2004)

Plaintiffs mistakenly construed the Code not only to compel access to their neighbor's land, but expected the court would require defendant to pay 66% of the cost to construct the private covered drain that would be used for his neighbors' benefit. The court correctly denied this relief, repeatedly.

Here, the court's order stops short of considering the damage obligation and prematurely allows access beyond the dictates of section 2-6 of the Code. However, more significant to the outcome of this appeal is the fact that the order did not include requisite factual findings regarding a proper discharge point, and the evidence could not

21

support the minimum requirements of the Code on this issue.

The intrusion upon defendant's private property rights should not be taken lightly even though he appeared *pro se*. This court must insist on the strict compliance with the Drainage Code before forcing one landowner to accept the unwelcome intrusions of another and creating a perpetual easement on the land without compensation. The order does not comply with the Drainage Code and must be set aside.

## CONCLUSION

For the foregoing reasons, the judgment of the Grundy County circuit court is reversed and the order vacated.

Reversed.

WRIGHT, J., with McDADE, PJ., concurring.

JUSTICE HOLDRIDGE, dissenting:

Plaintiffs' land is situated to the south of Defendant's land. On April 4, 2005, counsel for Plaintiffs sent a letter to Defendant stating, in pertinent part:

"Pursuant to the Illinois Drainage Code ***, the Estate of Merville Christensen and Frances Halpin are hereby seeking your permission to repair a certain drain i.e. field tile, which is a field tile and drain for the mutual benefit of the Christensen property, the Halpin property and your property. The Estate of Merville Christensen and Frances Halpin are proposing to drain by way of field tile the natural flow of water from their properties through your property and north

22

and exiting off of the James Schultz property, as has occurred for over the past 100 years.

Please note that the above referenced statute specifically allows them to drain water without interference, interruption or obstruction by you. It is the intent of the Estate of Merville Christensen and Frances Halpin to utilize this statute in releasing of the natural flow of water from their property.

I have enclosed copies of plat maps marked as follows: 'A' the property of the Estate of Merville Christensen, 'B' the Frances Halpin property, 'C' your property and 'D' the James Schultz property.

By way of history, it is our belief and understanding that the tile has been in place and the natural flow of water has existed in this fashion via existing field tile for approximately 100 years. It is the intention of our clients to begin work immediately on the repair and/or replacement of field tile so as to not lose this year's crop due to flooding. Please be aware that the field tile work proposed by the Estate of Merville Christensen and Frances Halpin will, in all likelihood, benefit your property and cause minimal inconvenience.

It is our purpose and intent of this correspondence, to obtain your permission and perform the above work in an amicable (friendly) fashion without the necessity of litigation. However, due to the impending planting season, time is of the essence and we will need your response within 5 days of the service of this document on you. In that regard, we ask that upon immediate receipt of this

23

correspondence, you contact the undersigned or, in the alternative, you have your representative contact the undersigned."

The letter then reiterated Plaintiffs' desire to avoid litigation but explained that they would file suit, as authorized by the Illinois Drainage Code (Code) (70 ILCS 605/1--1 et seq. (2004)), if such action became necessary.

On April 26, 2005, Plaintiffs filed a two-count complaint in the Grundy County circuit court alleging that Defendant had repeatedly prevented them from exercising their statutory right to drain water through his land. In Count I, they sought a declaratory judgment (1) "finding the natural flow of water from Plaintiffs' property is over and through the property of the Defendants,"[2] (2) "granting the Plaintiffs *** a right to continue to drain water from their property over the Defendants' property," and (3) "grant[ing] the right to go onto Defendants' property for the purpose of replacing and repairing tile." Plaintiffs also requested an order prohibiting Defendant "from interfering with [their] abilities and rights to naturally drain said water, repair the tile or to replace the tile on the Defendants' property." In Count II, they requested money damages for

---

[2]In addition to Peter Schultz (Defendant), the complaint named James Schultz and "Unknown Owners of Record" as defendants. Plaintiffs effected personal service on Peter and James, and they published notice to the Unknown Owners. Peter was the only person who appeared in court and challenged the action (pro se). James, whose land is situated north of Peter's land, was adjudged in default.

24

any crop loss stemming from Defendant's actions. Also on April 26, 2005, Plaintiffs filed a request to admit pursuant to Supreme Court Rule 216 (134 Ill. 2d R. 216).

Defendant filed a written answer admitting all paragraphs in Plaintiffs' complaint except the following three:

"8. [Count I] There does exist, on the belief of the Plaintiffs, certain drainage or field tile which is believed to have existed for approximately 100 years across Plaintiffs' property and drains through the property of the Defendants. The Plaintiffs have made various requests of the Defendants to allow Plaintiffs to repair said tile for the natural drainage of water from their property.

\* \* \*

12. [Count I] There will be no harm, nor injury to the Defendants if this Court were to grant Plaintiffs the right to naturally drain the respective properties over the property of the Defendants.

\* \* \*

13. [Count II] The Plaintiffs further and in addition thereto, request certain money damages in the amount of crop loss or damage suffered by the Plaintiffs for the crop year of 2005, yet to be determined, and any future crop loss as a result of the Defendants' actions."

Defendant filed a second answer denying the following paragraphs from Plaintiffs' request to admit:

25

"3.  The natural drainage of water from the property as contained in Exhibit 'C' is to the North.

4.  A field tile exists through the property contained in Exhibit 'C' and drains water from the property contained in Exhibits 'A' and 'B'.

5.  The field tile as described above has existed for more than 50 years.

6.  The natural drainage of water from the HALPIN property as described in Exhibit 'B' and the CHRISTENSEN property as described in Exhibit 'A' is over and through the property as described in Exhibit 'C'.

* * *

9.  PETER SCHULTZ has prohibited FRANCES HALPIN and the CHRISTENSENS from going onto his property for the purpose of replacing or repair of field tile.

10.  PETER SCHULTZ fails and refuses to repair or replace said field tile which is the subject matter of this proceeding.

11.  The field tile which is the subject matter of this proceeding carries the natural flow of water from the HALPIN and CHRISTENSEN property over and through the SCHULTZ property.

12.  The refusal to allow HALPIN and CHRISTENSEN onto the SCHULTZ property has caused excessive water on the HALPIN AND CHRISTENSEN property.

26

13. The refusal to allow the drainage of the SCHULTZ property has caused crop damage to the HALPIN and CHRISTENSEN property."

Defendant filed these answers on July 25, 2005.

Plaintiffs subsequently filed a motion for summary judgment. Defendant responded by averring that: he did not know if tiles existed as alleged by Plaintiffs; he would allow such tiles to be repaired upon proof that they existed, but he would not allow new tiles to be installed; he had left messages on Plaintiffs' answering machines advising them of such; the natural flow of water from Plaintiffs' land was eastward and had been blocked by a subdivision development, causing existing tiles to be filled with dirt; and there was a question of fact regarding how long the alleged tiles had existed on his land. Defendant said his land included both a building site and existing tiles that he did not want damaged. He also did not want a drainage easement running through the land because he planned to develop it in the future.

On November 4, 2005, the circuit court denied Plaintiffs' motion for summary judgment and instead granted them leave to enter Defendant's property "for the purpose of determining topography and find[ing] existing tiles." Plaintiffs were ordered to give Defendant at least 24 hours' notice and secure a liability insurance policy for at least $1,000,000. After Plaintiffs entered Defendant's land and completed their inspection, the matter proceeded to trial on May 26, 2006.

The first witness at trial, Roger M. Christensen (a plaintiff), testified that Plaintiffs' land was originally a 100-acre parcel owned by the Christensen family. In the

27

1990s, a strip on the eastern edge of the parcel was sold for a subdivision development,[3] and later the westernmost 65 acres were sold to "the Halpin brothers." Christensen testified that prior to these transactions, his family had owned and farmed the 100-acre parcel for as long as he could remember. He was 58 years old and had personally participated in the farm work. The parcel was bordered on the south by Rice Road, on the east by Coster Road, and on the north by Defendant's land. Coster Road bordered the eastern edge of Defendant's land as well.

Christensen was familiar with the natural course of drainage for the entire 100-acre parcel, stating that drainage was poor but flowed to the northeast. He described an instance from 1966 where he personally observed the drainage for several hours after a large storm dropped seven inches of rain. His observation occurred from ten or twelve different spots (five or six along Rice Road and five or six along Coster Road), including Defendant's land and James Schultz's land all the way up to where "several tile come up on the northeast corner." Christensen also got out into the field "a little bit." He observed that water from the entire 100-acre parcel was draining to the northeast over Defendant and James Schultz's land, as evidenced by crop debris being washed in that direction. Christensen testified that since then, nothing had happened to the land to alter the natural flow of water. This observation was consistent with a 1994 plat map showing

---

[3]At the time of trial, this strip consisted of 16 independently-owned home sites located along Coster Road.

28

that the southwest corner of the 100-acre parcel had an elevation of 593 feet while the northeast corner had an elevation of 586 feet.

Christensen further testified that the 100-acre parcel contained drainage tile which he personally repaired on five or six occasions during the 1960s and 1970s. This tile ran toward the north-northeast. During four of his repairs, he had actually seen water running inside the tile, and the water was flowing northward. Approximately two years prior to trial, Christensen spoke with Defendant about the north-northeast flow of water over their land. A small east-west ditch had been installed along the south edge of Defendant's property in the 1960s. Defendant told Christensen that he (Defendant) planned to eliminate the ditch because he did not think it was necessary. By the time of trial, the ditch had been "plowed under." Christensen recalled that when the ditch existed, it carried some drainage water eastward into another ditch running along Coster Road, whereupon the water flowed northward.

On cross examination by Defendant, Christensen testified that his family dug a two-acre pond on their land, with a duck blind, and the Halpins dug another duck blind on their 65 acres. Christensen denied that Plaintiffs' property ever contained field tiles running eastward into the ditch along Coster Road. He reiterated this denial on redirect examination. He also explained that his family dug the two-acre pond in compliance with a conservation program administered by the U.S. Department of Agriculture (USDA). The pond was intentionally located on the lowest spot of ground--its purpose being to "hold back" water during heavy rains, thus protecting lower landowners from excessive flooding. Christensen inquired of the USDA if the pond could be used for hunting

29

activities, and the answer he received was yes. The land his family owned at the time of trial was up for sale. Since he did not know what the future buyer would do with the land, he had no idea how much rainwater would be displaced by hard surfaces like roads and rooftops.

On recross examination, Christensen testified that he spent half a day at the pond site with USDA representatives, who looked at maps and shot elevations. These representatives approved the pond and said it would help landowners to the north by "giving them less water." Defendant countered this statement at trial by declaring, "I have talked to them also, and they also stated the water comes across my property harder[4] because the water from the south flows to the north." Christensen responded: "From the south to the north -- northeast. That's very good. We're on the same line now." Defendant continued asking questions suggesting that the pond altered the natural course of drainage, whereupon Christensen said any change that occurred had actually improved the drainage for Defendant's land. Such improvement included installation of seeping tiles recommended by the USDA. Finally, on redirect examination, Christensen explained that the pond did not alter the general course of natural drainage from the south to the northeast. If such alteration had occurred, the USDA would not have approved the project.

---

[4]Defendant's line of questioning reveals that he believed the pond somehow increased the flow of water onto his land during heavy rains.

30

The second witness at trial, Guy Richard Christensen (no relation to the Christensen plaintiffs),[5] testified that he worked as an engineer for Chamlin & Associates in Morris, Illinois, and had been a registered professional engineer since 1977. He was familiar with the process of shooting elevations and determining land grade, having performed those tasks thousands of times. As an employee of Chamlin & Associates, Guy participated in the engineering and excavation work for the water system servicing the 16 houses built on the east edge of Plaintiffs' land. This work occurred on the west side of Coster Road. Before the excavation started, Guy did not see any field tile exiting Plaintiffs' land at Coster Road. Neither was any such tile encountered during the excavation.

Guy testified that an expert named Mr. Wepprecht located tile running from the northeastern corner of the Christensen land toward the north-northeast through Defendant and James Schultz's land. Chamlin & Associates was retained to shoot elevations along that tile, and Guy was present in the field when the work occurred. Elevations were determined at five separate points, beginning at the northeast corner of the Christensen land and continuing northward to a point near Main Road.[6] The five elevations, measured from the top of the buried tile rather than the ground surface, and running south-to-north, were as follows: 585.77 feet, 585.12 feet, 584.73 feet, 584.15 feet, and 583.78 feet. The tile continued northward from the fifth point, but its terminus

[5]To avoid confusion with the Christensen plaintiffs, I refer to this witness as "Guy."

[6]Main Road runs east-west across the top of James Schultz's land and intersects with Coster Road.

31

was not located. Regarding the terminus, Guy said, "It appears it would come out on Main Road or near the corner of Main and Coster." He concluded that the tile was carrying water "to the northeast from the Christensen property across the respective Schultzs' property," and that the "natural flow of water" was to "the northeast."

While conducting cross examination, Defendant asserted that a steel tile discharged water along Coster Road near his south property line where he plowed over the small ditch. Regarding field tiles allegedly discharging along Coster Road from Plaintiffs' land, Defendant acknowledged, "In all honesty, I cant remember the tiles," but he claimed they once existed and had been redirected into the steel tile. He also asserted that the housing development along Coster Road altered the natural flow of drainage by sending more water onto his land. Guy responded to these points by testifying that: (1) if a metal storm tile ran eastward along Defendant's south property line and discharged at Coster Road, he would not consider it a field tile; (2) he had no information suggesting that Plaintiffs' land drained from west to east; and (3) the housing development along Coster Road did not increase water flow onto Defendant's property because each house had a catch basin, situated lower than the pavement, that accepted the surface water.

On redirect examination, Guy clarified that his conclusion about the natural north-northeast drainage encompassed Plaintiffs' land as a whole, including the Halpins' 65 acres. While conducting recross examination, Defendant asserted, "now when they are doing the development, the subdivision, the development, the pond out in the field and all of the duck blinds and all of the digging and everything, *** now it is all coming towards the north." Regarding the housing development specifically, he continued: "So when the

32

water flows towards the east and goes down the ditch, that's the way it is. And that is the -- where the whole problem is arising on this whole lawsuit, is that the water, once it bumps into these houses, once it built the houses up, that's where the problem's arising. Now you're wanting to send it all my way by means of a tile that we don't believe exists." Defendant also asserted that water flowing northward across his land stopped at a high point. Responding to questions from the judge, Guy explained that the amount of elevation loss documented by Chamlin & Associates was sufficient for water to flow nicely inside the tile. He also said he found no interruption or high point in the grade of Defendant's land.

On recross examination by Defendant, Guy explained why he did not identify an exit point for the tile: "It was not determined by Mr. Wepprecht which -- there's several tiles that outlet at the ditch on the northeast corner of the Schultzs' property at that intersection of the roadway. It was not determined which of those was the outlet tile for this existing tile that we shot the elevations of. *** [S]ince he did not determine that *** I did not know which one was it and what the elevation of it was." Defendant then asked, "So the tile that's exiting could be a lot higher and that's the reason it's backing up on my property?" Guy responded, "I guess that could be possible," but then added: "The only thing that would refute that is if Mr. Wepprecht had located that tile, which I believe he did and opened it, and it had flow in it going to the north, [then] I would assume it's not plugged to the north."

Plaintiff's Exhibit #7 is a survey map depicting the land and field tile as described by Guy. On the map, a notation at the spot where elevation was measured on the

Christensen land reads: "Tile exposed at this location is 8" V.C.T. Exact location of transition from 10" to 8" is unknown." The tile is shown proceeding north (and slightly east) through Defendant's land, and then straight north through James Schultz's land paralleling Coster Road. Consistent with Guy's testimony, the tile diagram stops just short of a discharge point. However, a notation on the map at the intersection of Coster Road and Main Road reads, "Exist. 60" pipe." Also, farther west on the map, an "alternate field tile location" is marked with a route going from Plaintiff's land, straight north through defendant and James Schultz's land, and discharging into an "existing ditch" along Main Road.

The next witness at trial was Richard R. Wepprecht, a professional farm drainage contractor with over 30 years of experience. Ninety percent of his business consisted of installing field tile. Wepprecht testified that he located a tile running from the Christensen land northward through Defendant and James Schultz's land. He found a sinkhole where the tile had broken and collapsed on the Christensen land just south of the property line with Defendant. From that spot he moved northward, locating and flagging the tile by probing about every 20 feet. He used approximately 30 flags to mark the route of the tile.

Wepprecht also performed some excavation to get down and visually inspect the tile. He used a backhoe because the ground was frozen. The excavation occurred at six different locations, which he marked on a map using labels "Dig #1" through "Dig #6" (Dig #1 being the northernmost and Dig #6 being the southernmost). At Dig #1, Wepprecht found a 10-inch clay tile on Defendant's land with one inch of sediment and

34

3½ inches of water inside. The water was running slowly toward the north. Wepprecht installed a piece of plastic corrugated tile at this location to repair a piece of clay tile that broke during his digging. At Dig #2, he found a 10-inch clay tile on Defendant's land containing three inches of dirt and no water. The tile was already cracked. At Dig #3, Wepprecht found a 10-inch clay tile on Defendant's land. The tile was full of dirt and already had a hole in it. At Dig #4, he found a 10-inch clay tile on Defendant's land that was already broken and completely filed with dirt. This tile was incapable of carrying any water. At Dig #5, Wepprecht found a 10-inch clay tile on Defendant's land that was already badly cracked. He also observed water pressure in the hole. The reason for this pressure was that water arriving at Dig #5 from the south had nowhere to go because a complete blockage existed farther down the line (as observed at Dig #4). At Dig #6, Wepprecht found an 8-inch clay tile on the Christensen land just south of the border with Defendant's land. The tile was cracked and clean of dirt. Water pressure was observed in this hole as well. From the location of Dig #6, Wepprecht's map showed the tile moving toward the 65 acres owned by the Halpins. He explained that tile commonly increases in diameter toward the end of a line because water volume is higher there. He also advised that clay tile is no longer manufactured, having been phased out and replaced by plastic corrugated tile.

In Wepprecht's professional opinion, the tile he located on the Christensen land and Defendant's land should be replaced with 12-inch plastic corrugated tile. The reason for plastic tile was that clay tile is no longer manufactured. The reason for 12-inch tile was that corrugated tile, unlike smooth clay tile, creates friction that slows the movement

of water.  Thus, a larger diameter is needed to maintain the same volume of flow.[7] Wepprecht opined that a 12-inch tile would properly address the drainage needs of Plaintiffs' land and also improve the drainage of Defendant and James Schultz's land.

On cross examination, when asked why he did not follow the tile to its discharge point, Wepprecht said, "[b]ecause I think we were supposed to not get into that homeowner's property down in their lawn."[8]  Defendant then accused Wepprecht of breaking his tile by digging with the backhoe, whereupon Wepprecht said he only broke the tile at Dig #1--and he replaced the broken piece with a new piece of plastic corrugated tile.  The other pieces of clay tile were already broken when he dug down to them.

The next witness was Frances E. Halpin, Jr. (a plaintiff), who identified his land lying west of the Christensens' land and south of Defendant's land.

_____

[7]This last point was not made during Wepprecht's testimony but rather upon consultation with counsel during closing arguments.  The consultation occurred in response to a question by the judge regarding why a larger diameter was recommended.

[8]Wepprecht's map depicted three general pieces of land situated vertically as follows: Plaintiff's land on the south (the Christensen land comprising the east side of the parcel and the Halpin land comprising the west side); Defendant's land in the middle; and James Schultz's land on the north.  In the northeast corner of James Schultz's land (southwest corner of the intersection of Coster Road and Main Road), the map shows a small square labeled "Building Site."  The path of the tile runs parallel with Coster Road and into that square.

Following Halpin, Defendant took the stand and testified that water from Plaintiffs' land had always flowed eastward until the subdivision was developed. Because of the subdivision, and the USDA conservation program, the natural flow of water was changed toward the north. He further testified that Plaintiffs' field tiles ran eastward and, at some time in the past, discharged into a ditch along Coster Road. The tiles never connected with tiles on his land. Defendant noted plans for additional development on the Christensen land and complained that those plans would cause further change in the natural course of drainage, sending even more water northward onto his land.

On cross examination, Defendant reiterated his claim that tile on the Christensen land did not connect with his own tile but instead ran eastward. He acknowledged that he never entered Plaintiffs' land or dug along his south property line to verify this claim. Regarding tiles that discharged north of his land, he acknowledged an exit site on Coster Road, another exit site at the intersection of Coster Road and Main Road, and others on Main Road. He had seen these tiles discharging water but testified that he did not know where the water came from. In his response to Plaintiffs' motion for summary judgment, Defendant had stated: "[Plaintiffs] can repair any broken tile or tiles found in my property. However, I do not want them to install a whole new line where tiles did not exist." When confronted with this statement on cross examination by Plaintiffs' counsel, Defendant said it only applied if a tie-in could be established between tile from the Christensen land and tile on his land.

Roger M. Christensen testified in rebuttal that he never altered the direction of tile on the Christensen property. He never modified the tile beyond making repairs, and

37

neither was he aware of anyone else doing so. Moreover, during excavation for the 16 home sites along Coster Road, he specifically looked for disturbance of field tiles and saw none.

While conducting cross examination, Defendant argued with Christensen about the direction of tile lines on the Christensen property. He also asked about the seeping tile installed in conjunction with the USDA conservation program. Christensen responded that seeping tile was installed so water would go into the pond; the tile did not alter the natural flow of drainage from south to north. He said when water comes out of the pond, it flows to the northeast, and before the pond was installed, water also flowed toward the northeast.

During closing arguments, on the subject of Wepprecht's recommendation for replacement with 12-inch tile, the judge interrupted Plaintiffs' counsel and stated:

"Mr. Rigazio and Mr. Schultz, here I think is what we're talking about, 605/2-5. 'If on the trial of the case,' which we've now completed, 'it is found that the proposed drain will be of ample capacity, will not materially damage the land of the defendant,' that's Mr. Schultz, 'and will empty into a, a natural water course, b, the highway authority, or c, any other outlet which the plaintiff has the right to use, then the finding or verdict shall be for the plaintiff, and the defendant shall be allowed such actual damages only as will be sustained by entering upon the land and construction of the drain thereof after keeping the same in repair.'

38

All right. So what we're talking about here is proposed drain will be of ample capacity, so what we're talking about now is is eight ample capacity or do you have to have 12 to have ample capacity. And let's just all emphasize that we're not talking about making ample capacity for any future subdivision. We all agree with that."

Counsel for Plaintiffs agreed. It was during this discussion that counsel, after consultation, informed the court that since "[i]t's corrugated tile as opposed to the smooth clay tile," it "creates more friction" and "holds the water up," necessitating a wider diameter to maintain the same flow. Plaintiffs further requested an order compelling Defendant to bear part of the cost of replacing the tile. During his own closing arguments, Defendant said he wanted Plaintiffs to run their tile eastward and stay off his land. He also reiterated his claim that no tile from Plaintiffs' land tied into tile on his property.

The judge entered an order granting Plaintiffs' request for a declaratory judgment. The order specifically stated:

"The natural flow of water is from Plaintiffs' property over and through Defendants' property. Plaintiffs may continue to drain in that direction and may go onto Defendants' property to replace and maintain the tile in existence. Plaintiffs may install the 12-inch tile testified to by Wepprecht, but must pay damages, if any, in accordance with 605/2-6."

Plaintiffs filed a motion to reconsider, noting that the judge failed to address their request for an order compelling Defendant to bear a portion of the replacement costs. They again requested such an order. The judge subsequently ruled as follows: "Plaintiffs' motion to reconsider is granted. The relief sought therein is denied." The instant appeal by Defendant followed.

Our sole issue is whether the trial judge erred in finding that the general course of natural drainage was from Plaintiffs' land over and through Defendant's land. I respectfully disagree with the majority's assertion that more is involved in this appeal. The majority supports its assertion as follows:

"Defendant writes in his *pro se* brief submitted to this court, 'The tiles were never tied together.' As his contention of error, defendant concludes that plaintiffs should not 'be allowed to tie into my field tiles, since their field tiles never did.' Again, in his reply brief he states, 'Halpins' could never prove a tie in or an exit of their field tiles.' Relying on the Code, counsel for plaintiff, responds by framing the issue for our consideration as follows:

'Whether the court errored [*sic*] in giving Plaintiffs the right to enter onto the property of Defendants for the purpose of erecting, replacing, or repairing tile...in accordance with 70 ILCS 605/1-1 *et al* [sic].'"

This latter statement is taken from the front matter of Plaintiffs' brief. In my view, the statement does not establish an additional issue for review because, inter alia,

Plaintiffs' actual argument does not include such an issue. In the argument section of their brief, a single issue is delineated as follows:

> "The judgment of the trial court was not an abuse of discretion, and the court found that the Plaintiffs have established by a preponderance of evidence that the natural flow of water is from the south to the north/northeast. This would support the Plaintiff's position and deny the Defendant any relief from this court. The Defendant presented no evidence whatsoever to establish that the water flowed anywhere but in accordance with Plaintiff's expert testimony."

A reading of Plaintiffs' argument reveals a sole contention that the trial judge did not err in finding that the general course of natural drainage was from their land over and through Defendant's land. There simply is no argument on any other issue. This fact also addresses the majority's references to Defendant's reply brief because "[t]he reply brief *** shall be confined strictly to replying to arguments presented in the brief of the appellee." 210 Ill. 2d R. 341(j); see also 210 Ill. 2d R. 341(h)(7) (points not argued in the appellant's opening brief cannot be raised in the reply brief). Finally, Defendant had a specific reason for arguing that no tie-in existed, and his reason was not to raise a separate issue. He made this argument to support his overall claim that the general course of natural drainage was eastward rather than northward through his property. This is why he asserted that Plaintiffs' tiles ran eastward and discharged into the ditch along Coster Road, although no evidence supported his assertion.

41

These observations accord with Defendant's own representation at trial: "So when the water flows towards the east and goes down the ditch, that's the way it is. And <u>that is</u> the -- <u>where the whole problem is arising on this whole lawsuit</u>, is that the water, once it bumps into these houses, once it built the houses up, that's where the problem's arising. Now you're wanting to send it all my way by means of a tile that we don't believe exists." (Emphasis added.) I take Defendant at his word. The whole problem, by his framing of the issue, is whether water flows onto his property because of alterations to Plaintiffs' land, or whether water naturally flows that way. Plaintiff argued the former at trial, the judge found the latter, and Plaintiff appealed that finding. Our review should be confined to the issue he presented. See <u>Meyers v. Woods</u>, 374 Ill. App. 3d 440 (2007). Perhaps counsel would have raised other issues, but Defendant did not retain counsel. Having made that choice, "he is not entitled to any special consideration," and I believe this court should "not apply a more lenient standard" for him. <u>People v. Fowler</u>, 222 Ill. App. 3d 157, 163 (1991).

As to the trial judge's decision, our standard of review is manifest weight of the evidence (<u>Callahan v. Rickey</u>, 93 Ill. App. 3d 916 (1981)), and a decision does not fail that standard unless the opposite conclusion is clearly evident from the record (<u>First Baptist Church of Lombard v. Toll Highway Authority</u>, 301 Ill. App. 3d 533 (1998)). Moreover, especially in a case involving contradictory testimony, it is the trial judge's province as trier of fact to assess witness credibility, weigh the evidence, and determine the preponderance thereof. <u>Callahan</u>, 93 Ill. App. 3d 916. Based on the evidence recited above, the trial judge clearly did not contravene the manifest weight of the evidence on

42

the sole issue presented in this appeal. Contrary to the majority's assertion, I do not take the position that "the language of section 2-1" creates "an inalienable right" for dominant landowners. My position is simply that the trial judge did not commit reversible error in his finding regarding "the general course of natural drainage." 605 ILCS 605/2--2 (West 2004).

For these reasons, I respectfully dissent.