# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Miller v. Hecox*, 2012 IL App (2d) 110546

---

| | |
|---|---|
| Appellate Court Caption | TINA MILLER, Individually and as Special Administrator of the Estate of Kyle Christian, Deceased, Plaintiff-Appellant, v. KARAC L. HECOX and CHRISTIE J. MOORS, Defendants (Kallen Szell, Defendant-Appellee). |
| District & No. | Second District<br>Docket No. 2-11-0546 |
| Filed | May 10, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Summary judgment was properly entered for defendant in an action alleging that defendant was negligent after voluntarily undertaking to help plaintiff's son after he overdosed on heroin and later died or that he was part of a civil conspiracy to purchase and use heroin or a conspiracy to care for plaintiff's son, since defendant did not engage in any activity that would rise to the level of a voluntary undertaking such that he owed a duty of care to plaintiff's son and there was no issue of material fact as to the question of reliance, plaintiff's arguments based on the alleged conspiracy to purchase and use heroin were speculative and unsupported by authority, plaintiff's son did not die as a result of a conspiracy involving defendant, and there could have been no conspiracy to render care negligently. |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 08-L-55; the Hon. Eugene G. Doherty, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Rodney W. Kimes, of Bolgrien, Koepke & Kimes, S.C., of Beloit, Wisconsin, for appellant. |
| | Raymond P. Fabricius, of Fabricius, Koening & Lindig, of Ottawa, for appellee. |
| Panel | JUSTICE HUDSON delivered the judgment of the court, with opinion. |
| | Presiding Justice Jorgensen and Justice McLaren concurred in the judgment and opinion. |

**OPINION**

¶ 1                                              I. INTRODUCTION

¶ 2        Plaintiff, Tina Miller (individually and as special administrator of the estate of Kyle Christian), filed a multicount complaint in the circuit court of Winnebago County. Plaintiff is the mother of Kyle Christian, who is deceased. The complaint was directed against defendant, Kallen Szell, and two other individuals (Karac L. Hecox and Christie J. Moors) who are not parties to this appeal. Plaintiff claimed that defendant was negligent in rendering aid to Kyle after undertaking a duty to do so and that Kyle's death was the result of a civil conspiracy of which defendant was a part. The trial court granted defendant summary judgment on both claims. Plaintiff now appeals. We agree with the trial court and affirm.

¶ 3                                              II. BACKGROUND

¶ 4        The following is taken from the depositions of the three defendants in the action below. We will begin with the testimony of Karac Hecox. He testified that he met Kyle in the summer of 2006. They met through Christie Moors, whom Hecox was dating. Hecox started using heroin in April 2006, and by the end of the summer that year, he was using the drug multiple times every day. Hecox, Moors, and two other individuals financed their drug use by stealing copper out of new-construction homes and stealing from stores.

¶ 5        On the day Kyle died, Hecox and Moors woke up experiencing withdrawal symptoms. They had not stolen anything the previous evening, so they did not have anything to sell at the scrap yard. Kyle called and said there was some copper in his garage he was willing to sell. Kyle picked up Hecox and Moors. They then went to a scrap yard and sold the copper for $60. Hecox contacted a heroin dealer with whom he often dealt. As they were going to

buy the heroin, Hecox and Moors told Kyle, "[J]ust because you're getting two bags doesn't mean you need to do two bags." They purchased six bags. Hecox stated that he had never had a problem with this dealer's heroin before. Hecox testified that the heroin he got that day was "perfectly fine."

¶ 6    Kyle usually took only one bag of heroin. Hecox believed that Kyle did not have a high tolerance for the drug. One bag would make him "really, really, really high, like almost incoherent high." When a person is high, Hecox explained, the person is "extremely tired" and "struggling to stay conscious." Hecox and Moors were no longer using heroin to get high; rather, they were simply trying to avoid withdrawal symptoms. Hecox testified that Kyle was "always kind of an emotional character."

¶ 7    After they acquired the heroin, they used it in Kyle's car. Each of them ingested two bags. At some point, Moors looked at Kyle and noted that he was pale. Hecox checked his pulse, which was faint, and noted that his breathing was abnormal. Hecox had never seen anyone overdose before. He performed CPR. Moors suggested that they go to Brian Hoshaw's house, because Kyle had overdosed in Hoshaw's presence in the past. Hoshaw examined Kyle and checked his pulse. He stated that Kyle had "done this a handful of times with him before." Hoshaw told Hecox and Moors to stay with Kyle for a few hours. If nothing changed, Hoshaw continued, Kyle would be fine; however, if something changed–such as if Kyle stopped breathing–they should take him to the hospital.

¶ 8    The three left Hoshaw's house. They then got a call from defendant and defendant's girlfriend. Defendant wanted to buy heroin. They met at the Spring Garden restaurant. Defendant gave Hecox money. Hecox and Moors, with Kyle still in the car, went to get more heroin. After returning to the restaurant, Hecox, Moors, defendant, and his girlfriend all did heroin in defendant's car. Hecox and Moors explained what was happening with Kyle. Defendant and his girlfriend went to look at Kyle. When asked whether defendant or his girlfriend had entered Kyle's vehicle, Hecox replied, "I want to say yes." Defendant and his girlfriend asked whether Hecox thought Kyle would be all right. Hecox testified that defendant and his girlfriend spoke with Kyle. The group discussed Kyle's condition, and Hecox called Mike Monge, who was "experienced in overdosing." Monge did not "want to be any part of anybody overdosing." Hecox could not recall if the others were within earshot when he called Monge.

¶ 9    After Hecox got off the phone with Monge, the group went inside the restaurant to have coffee. Hecox told the group that Monge did not offer any advice. The group was nervous and had "a little air of wariness." Kyle was extremely pale. Hecox knew that if anyone saw him the police would be called. Hecox testified that, before they entered the restaurant, he had placed a jacket in the window of Kyle's car so that if anyone pulled up next to the car they would not see how bad Kyle looked. The others were present when Hecox did this. Hecox responded negatively when asked whether "everybody was out there trying to help the situation, trying to figure out ideas to help." The group remained in the restaurant for two hours. Every 15 to 20 minutes, Hecox would go out to the car to check on Kyle "to make sure he was still breathing [and] still had a pulse." Kyle "was actually seeming to go get [sic] a little better." His breathing was becoming somewhat more regular. At some point, defendant's girlfriend said "something along the line of you should think about calling an

ambulance." Defendant did not say anything.

¶ 10    Subsequently, "it came time to leave." Hecox went to Kyle's car and sat with him for 5 or 10 minutes. Kyle "actually started to respond at this point." Hecox told him that the group was leaving. Hecox asked whether he should call an ambulance or Kyle's mother, and Kyle responded in the negative. Defendant then drove everyone home. The next day, Hecox was arrested for stealing copper. A few days later, detectives told him that they had found Kyle dead in his car.

¶ 11    On further questioning, Hecox explained that he did not want to make the situation a concern of defendant and his girlfriend. He believed that Hoshaw "knew what he was talking about" as "he had experienced Kyle overdosing several times." Hecox testified that he believed that Kyle would be fine. He explained: "I had sold [defendant and his girlfriend] heroin, they were friends, and I didn't want to say this guy overdosed with us, what are we going to do about it. It's not–it wasn't their problem." Hecox did not feel that Kyle's condition was "a discussion that [the group] was having at the table [in the restaurant]."

¶ 12    During cross-examination by defendant's attorney, Hecox stated that it took him and Moors about 50 minutes to obtain the heroin for defendant. Also, when Hecox performed CPR on Kyle, defendant was not present. While the group had coffee in the restaurant, Hecox periodically checked on Kyle. When he returned from doing so, members of the group asked how Kyle was doing and Hecox reported what he observed. Outside of this, there was no conversation about Kyle in the restaurant. When Hecox checked Kyle before the group left the restaurant, Hecox asked Kyle if he was going to be all right and "Kyle mumbled 'Ah-Ha.' When they left, Hecox believed that Kyle would be fine. Hecox agreed that, contrary to his earlier testimony, he did not place the jacket in the window until the group was leaving.

¶ 13    Moors' attorney also cross-examined Hecox. Hecox stated that Kyle had overdosed at Hoshaw's house on several occasions as well as a "couple of times" with a girl named Amanda. Both he and Moors were aware of this. However, he and Moors had never previously been present during one of Kyle's overdoses. When he went to get heroin for defendant, Hecox purchased four bags. Defendant waited in his car in the parking lot of the Spring Garden restaurant, along with his girlfriend. When Hecox returned, he gave defendant the four bags (though he had cut them earlier). Defendant and his girlfriend snorted some of the heroin. Hecox and Moors each ingested one more bag as well. This took place in defendant's car. While the group had coffee in the restaurant, no one other than Hecox went out to Kyle's car to check on him. The sun was going down when they left the restaurant, and Hecox thought that it was about 8 p.m. Hecox and Moors both tried to call Kyle the next day. When they could not reach him, they "got a little worried."

¶ 14    During redirect examination, Hecox explained that, when he spoke to Kyle in the car right before the group left the restaurant, they were not having a conversation. Rather, Kyle was simply responding to questions. Hecox reaffirmed that he believed that Kyle's condition had improved while the group had coffee, pointing to Kyle's responses and his improved breathing. He also testified that Moors never suggested they call an ambulance. She did not aid with CPR. However, she suggested seeking assistance from Hoshaw. Hecox acknowledged that they passed near a hospital after leaving Hoshaw's house, on the way to

-4-

the restaurant.

¶ 15        We now turn to the deposition of Christie Moors.[1] She testified that she had been involved in a dating relationship with Hecox from early 2006 to March 2007. She was also a friend of Kyle, and she knew defendant. Defendant's girlfriend died in October 2007 in an accident involving an all-terrain vehicle. She and Hecox did not speak very much about Kyle's death.

¶ 16        Moors testified that, during the day preceding Kyle's death, she left home sometime in the afternoon. Kyle picked up her and Hecox at her apartment. They drove around the west side of Rockford for a few hours. Sometime after 4 p.m., they went to a gas station, and Hecox "ended up with some heroin in his possession." Eventually, they arrived at the Spring Garden restaurant. Defendant and his girlfriend were there. They wanted some heroin. Kyle was sitting in the passenger seat with his eyes closed. He was breathing but not speaking. Kyle was in that condition because he had used some of the heroin that Hecox had obtained earlier in the day.

¶ 17        Moors testified that Kyle had previously consumed heroin by snorting it and by injecting it. While Kyle did not use heroin every day, he used it frequently. Moors and Kyle would get together several times a week.

¶ 18        Moors continued that, after Kyle first had a reaction to the heroin he ingested, they drove to Hoshaw's house. Kyle had "had a bad reaction to using heroin a handful of times in the past in [Hoshaw's] presence." Hoshaw stated that he had seen Kyle in a worse condition. He also told Moors and Hecox that they should not take him to the hospital unless they had to. Hoshaw told Moors that Kyle would be okay. Moors testified that Hecox had never been around anyone who had a bad reaction to heroin before and he became "extremely upset." Hecox attempted CPR even though Kyle had not stopped breathing.

¶ 19        After leaving Hoshaw's house, Moors testified, they went to the Spring Garden restaurant. On the way, Kyle sat in the front passenger seat with his eyes closed, not speaking but breathing normally. He was not making any involuntary movements, drooling, or making any sounds. Moors did not think that Kyle moved at all on the trip from Hoshaw's house to the restaurant.

¶ 20        After they got to the restaurant, Hecox called defendant. Hecox told Moors that defendant and his girlfriend were coming to the restaurant. He also stated that he wanted to go into the restaurant and get coffee. Moors wanted to remain outside until Kyle "woke up and started speaking." Moors and Hecox argued about this for a while, and Hecox eventually won the argument. When defendant and his girlfriend arrived, they parked a spot or two away from Kyle's car. Hecox got into defendant's car. Moors could not remember whether she did. Subsequently, she, Hecox, and Kyle drove in Kyle's car to a gas station. Moors did not know if defendant was aware of Kyle's condition at that point. She also could not remember whether defendant and his girlfriend came to Kyle's vehicle before they left for the gas station, but she stated that they never entered Kyle's car. When they got to the gas station,

---

[1]Moors' testimony was not presented chronologically, and we set it forth here as she gave it.

-5-

Hecox purchased heroin. Kyle was still not speaking or moving. His breathing, however, was normal.

¶ 21    After they returned to the restaurant, Hecox, defendant, and defendant's girlfriend ingested heroin. Either defendant or his girlfriend asked if Kyle was all right. When asked whether anyone checked on Kyle, Moors answered that Hecox would not let defendant or his girlfriend "get into Kyle's car or go and, you know, get close to him or anything like that." They went into the restaurant and remained there for "[a]t least an hour." Moors could not recall what they talked about, but she stated that Kyle was not "the main topic of conversation." Defendant and his girlfriend asked about Kyle's condition a "couple [of] times." The group could see Kyle from where they were sitting. Moors noted that defendant's girlfriend looked at Kyle at least five times and that she probably did so as well. Defendant was sitting so that he was looking toward Kyle. On two occasions, Moors went outside to check on Kyle. He was breathing, and his heart was beating, which Moors checked by placing her hand on his neck.

¶ 22    Eventually, the group decided to leave, though Moors did not want to leave Kyle. She got into Kyle's vehicle, shook his arm, and said his name a few times. He did not open his eyes; however, he did provide coherent answers to questions that she put to him. Moors testified that she did not "believe" that defendant or his girlfriend went to Kyle's car. She explained that "Hecox didn't want them close to Kyle." Moors did not remember defendant's girlfriend wanting to get an ambulance at that point. She did state that they were aware that Kyle was having a bad reaction to heroin and that he was not moving or speaking. As defendant was driving Moors and Hecox home, defendant's girlfriend asked whether they should call an ambulance. Moors testified that she did not believe that Kyle needed an ambulance at that point, based on his having spoken to her.[2] Moors stated that, based on what Kyle and Hoshaw had told her, Kyle had been in this condition on a "couple [of] occasions." Sometime before they left, Hecox placed a jacket over the window of the door on the driver's side of Kyle's car.

¶ 23    Defendant also testified via deposition. He testified that he did not know Kyle prior to March 2007. Defendant met Hecox through mutual friends. Hecox never had a cell phone, so defendant would contact him through Moors' phone. When asked whether Kyle ever associated with this group, defendant replied: "I don't know. I never met him. I really don't know what he looks like." Defendant testified that he interacted with Hecox "maybe like once every like month or so." Defendant invoked the fifth amendment when asked whether he and his girlfriend ever used heroin together. He further testified that he had seen Hecox and Moors use heroin and that his girlfriend did not use the drug.

¶ 24    On March 7, 2007, he received a telephone call from Moors and Hecox, stating that they wanted to meet for coffee. Defendant was at Walmart with his girlfriend at the time, and they agreed to meet for coffee at the Spring Garden restaurant. Defendant recalled arriving at the restaurant, but he could not recall with whom he first spoke. He parked and, after smoking a cigarette, went into the restaurant. At some point before they went into the restaurant,

_____

[2]Four pages from Moors' deposition are missing from the record at this point.

defendant acknowledged, Moors and Hecox left in a car. Defendant denied knowing where they were going. Defendant recalled having a conversation "from car to car" prior to their leaving. He did not recall what it was about. Defendant noted that there were three people in the car.

¶ 25    Hecox and Moors were not gone long, and when they returned, one of them (defendant could not recall which one) got into his car and smoked a cigarette. Neither Hecox nor Moors used heroin in defendant's car. Defendant's girlfriend asked about Kyle and was told that he was fine and that he was sleeping. When asked whether he was concerned about Kyle, defendant answered: "Not really. I just mind my own business." Hecox and Moors had explained what had taken place with Kyle and that he had taken too much heroin. They stated that he was breathing and that he was fine. Defendant added, "I trusted them and I didn't know the kid." Defendant could see Kyle through the window, but "[n]ot well," and he could not tell if Kyle was moving. Hecox told defendant that he had given Kyle CPR earlier. While they were having coffee, defendant's girlfriend asked if she could check on Kyle. Hecox stated that he would do so. Defendant did not recall Moors checking on Kyle. Defendant testified that they were at the restaurant for an hour to an hour and a half. He did not remember what the group discussed, remembering only that Kyle was not the "main focus."

¶ 26    Defendant further testified that he did not see Moors or Hecox use heroin. When Hecox first called defendant that day, Hecox "seemed normal" and did not seem "alarmed." While in the restaurant, Hecox asked defendant for a ride home. Before leaving the restaurant, "they checked on [Kyle and] said he was okay." Defendant testified that he "didn't see the kid" and "didn't know his condition." Defendant clarified that it was Moors who had checked on Kyle at that point. Defendant denied knowing who put the jacket in the car's window. He reiterated that he never walked over to Kyle's car or checked on Kyle. Defendant agreed that Hecox and Moors were "stressed out" by the situation. Defendant denied that certain portions of a written statement he gave to the police were true, including that Moors and Hecox told defendant that they did not want to be connected to Kyle's death and that they said they were going to call an ambulance.[3]

¶ 27    The trial court concluded that, taking the evidence set forth in these depositions in the light most favorable to plaintiff, defendant was entitled to summary judgment. Plaintiff now appeals. For the reasons that follow, we affirm.

¶ 28                                    III. ANALYSIS

¶ 29    On appeal, plaintiff argues that issues of material fact exist with respect to two separate theories of recovery, specifically, that defendant negligently performed a voluntary undertaking (see, *e.g.*, *Claimsone v. Professional Property Management, LLC*, 2011 IL App (2d) 101115, ¶¶ 20-22) and that defendant was a part of a civil conspiracy such that he was liable for Kyle's death (see, *e.g.*, *In re Estate of Holmes*, 2011 IL App (4th) 100462, ¶¶ 17-18). Summary judgment is a harsh remedy and should be granted only where the movant's entitlement to judgment is clear and free from doubt. *Pekin Insurance Co. v. Precision Dose,*

---

[3]Four pages of defendant's deposition are also missing from the record.

*Inc.*, 2012 IL App (2d) 110195, ¶ 28. It is appropriate only where "all of the pleadings, depositions, admissions, affidavits, and all permissible inferences, analyzed in the light most favorable to the nonmovant, so clearly favor the movant that no fair-minded person could dispute the movant's right to judgment in his favor." *Thompson v. Platt*, 116 Ill. App. 3d 662, 664 (1983). The record must be construed strictly against the movant and liberally in favor of the party opposing the motion. *Smith v. Associated Bureaus, Inc.*, 177 Ill. App. 3d 286, 289 (1988). Review of a grant of summary judgment presents a question of law, subject to *de novo* review. *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 640-41 (2002). Under the *de novo* standard, we owe no deference to the trial court's ruling (*Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 595 (2011)) and are free to disregard its judgment and substitute our own (*People v. Davis*, 403 Ill. App. 3d 461, 464 (2010)). With these standards in mind, we now turn to plaintiff's arguments.

¶ 30                                        A. Voluntary Undertaking

¶ 31        Plaintiff first contends that facts exist sufficient to entitle her to judgment on the theory that defendant engaged in a voluntary undertaking to aid Kyle. Such a cause of action is for negligence; hence, a plaintiff must prove a duty on the part of the defendant, a breach of that duty, and damages proximately caused by the breach. *Thurman v. Champaign Park District*, 2011 IL App (4th) 101024, ¶ 9. In a claim like the present one, a plaintiff relies on the voluntary undertaking to establish the existence of a duty where one would not otherwise lie. *Day v. Menard, Inc.*, 386 Ill. App. 3d 681, 683-84 (2008). The duty is "limited to the extent of the undertaking." *Id.* at 683. One who voluntarily renders some service or undertakes some action must do so using ordinary care and may be held liable for damages proximately caused by the negligent performance of that service or action. *Weisblatt v. Chicago Bar Ass'n*, 292 Ill. App. 3d 48, 53 (1997). Cases distinguish between "nonfeasance" (the failure to perform a necessary act) and "misfeasance" (the negligent performance of an act). *Bourgonje v. Machev*, 362 Ill. App. 3d 984, 996 (2005). An "essential element" of a claim based on nonfeasance is that the plaintiff relied upon the defendant's promise to perform the essential service. *Claimsone*, 2011 IL App (2d) 101115, ¶ 22. The voluntary-undertaking doctrine is to be narrowly construed. *Id.*

¶ 32        Two sections of the Restatement (Second) of Torts provide further guidance. Section 323, which our supreme court set forth in *Wakulich v. Mraz*, 203 Ill. 2d 223, 243 (2003), provides as follows:

>       "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
>       (a) his failure to exercise such care increases the risk of such harm, or
>
>       (b) the harm is suffered because of the other's reliance upon the undertaking." Restatement (Second) of Torts § 323 (1965).

Additionally, section 324, upon which the supreme court also relied in *Wakulich*, 203 Ill. 2d at 244, provides:

"One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by

(a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or

(b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him." Restatement (Second) of Torts § 324 (1965).

The supreme court has also stated that, generally, where "a host merely permits an intoxicated guest to 'sleep it off' on the host's floor, the host does not thereby assume an open-ended duty to care for the guest and assess the guest's medical condition." *Wakulich*, 203 Ill. 2d at 243.

¶ 33    Thus, to avoid summary judgment, plaintiff must identify evidence in the record that would raise a triable issue of fact as to whether defendant either voluntarily undertook to render services to Kyle or otherwise took charge of Kyle's care. To this end, plaintiff points to the following evidence and inferences that can be drawn from the depositions taken in this case: (1) defendant knew that Kyle had taken too much heroin and was overdosing; (2) defendant asked about Kyle's condition; (3) defendant knew Hecox had given Kyle CPR; (4) defendant walked to Kyle's car, opened the door, observed Kyle, and "possibly" entered the car; (5) the group discussed Kyle's condition, including what should be done about it; (6) while having coffee, defendant repeatedly looked out the window to check on Kyle; and (7) after the group left the restaurant in defendant's car, defendant asked if Kyle was okay and the group discussed calling an ambulance.

¶ 34    Plaintiff attempts to analogize this case to *Wakulich*. In that case, the decedent, a 16-year-old female, consumed a quart of a liquor called Goldschlager, at the encouragement of two of the defendants. The defendants induced the decedent to consume the alcohol by " 'offering monies, by goading and by applying great social pressure.' " *Id.* at 226. The decedent lost consciousness. Two of the defendants placed her in the family room and observed that she was vomiting and making gurgling noises. Subsequently, they removed her vomit-soaked blouse and put a pillow under her head to keep her from choking. The defendants refused to drive her home or contact her parents. Further, they did not seek medical attention and kept others from calling for medical assistance. The decedent died the next day. After restating the facts of *Wakulich*, plaintiff simply states that this case is analogous, without explaining how.

¶ 35    In fact, *Wakulich* strikes us as being quite distinguishable. Notably, defendant did not encourage Kyle to consume heroin, while the defendants in *Wakulich* encouraged the decedent to consume alcohol. The defendants in *Wakulich* moved the decedent, cleaned her up, and placed a pillow under her head. At most, according to Hecox, defendant "possibly" got into Kyle's car. Beyond that possibility, defendant had no physical contact with Kyle (indeed, there is no evidence that defendant did anything once inside the car, assuming he entered it). While both defendant and the defendants in *Wakulich* did not seek medical assistance, only the defendants in *Wakulich* prevented others from seeking it. Defendant did

not dissuade anyone from seeking outside aid. Clearly, *Wakulich* provides little guidance here.

¶ 36   Plaintiff also relies on *Simmons v. Homatas*, 236 Ill. 2d 459 (2010). In that case, the defendant drove to a fully nude strip club (which was also a defendant) that did not serve alcohol due to licensing issues. However, the club permitted patrons to bring their own alcohol, and it sold items for making drinks. When the defendant arrived, he utilized the club's valet service (which was required). At about 11 p.m., the defendant was visibly intoxicated. Club employees found him vomiting in a rest room, and he was ejected from the club. The employees told the valet service to bring the defendant's car to the front door. When the car arrived, the employees opened the door and told the defendant to leave. Shortly thereafter, he was involved in a traffic accident that resulted in three fatalities. The supreme court first recognized the well-established rule that owners of taverns, restaurants, and others generally have no duty to determine whether a person is fit to drive. *Id.* at 474. It distinguished such situations, explaining that, while the general rule is based on the fact that such a duty would entail a significant burden, in *Simmons* such a concern was not at issue, since it was undisputed that the club's employees knew that the defendant was intoxicated. *Id.* at 474-75. Plaintiff reasons that, since defendant knew that Kyle was suffering an overdose, such knowledge should give rise to a duty. We find plaintiff's argument unpersuasive. In *Simmons*, knowledge that the defendant was intoxicated did not give rise to an open-ended duty to assist the defendant; rather, the club "acquired a duty not to encourage [or] assist [the defendant] in the tortious conduct of driving while intoxicated." *Id.* at 475. Hence, *Simmons* provides no foundation for a duty to render assistance arising from the simple knowledge that someone is in distress, which would be an extremely broad duty and entail a significant burden, as noted above.

¶ 37   Moreover, our review of the evidence upon which plaintiff relies reveals nothing approaching a voluntary undertaking on defendant's part to care for Kyle. This evidence fits into three categories: defendant knew the gravity of Kyle's condition; defendant investigated Kyle's condition by observing Kyle; and defendant spoke with the group about Kyle's condition. Defendant did not, however, actually do anything about Kyle's condition–much less do it negligently. As such, there is no evidence indicating a voluntary undertaking. We would be loath to impose a duty under such circumstances, as it would dissuade bystanders from rendering assistance voluntarily. If a person could be held liable simply because he was aware of and discussed someone's need for assistance, many would actively avoid such situations and not be in a position to render voluntary aid. The consequences of imposing a duty are a factor to consider in deciding whether one exists. *Bajwa v. Metropolitan Life Insurance Co.*, 208 Ill. 2d 414, 427 (2004). That such a duty would deter Good Samaritans would be a grave consequence indeed.

¶ 38   This brings us to the related question of whether defendant's purported misconduct constituted misfeasance or nonfeasance. This is significant because in the latter case, a plaintiff must show reliance upon a defendant's promise to render aid. *Bourgonje*, 362 Ill. App. 3d at 997. Plaintiff argues that defendant's conduct amounted to misfeasance in that he negligently performed his voluntary undertaking to aid Kyle. Plaintiff attempts to analogize the instant case to an example the supreme court set forth in *Wakulich*. There, the court

-10-

explained that a failure to blow a whistle when necessary while driving a train, though inaction, is affirmative misconduct in that it amounts to the negligent operation of the train. *Wakulich*, 203 Ill. 2d at 246. However, as explained above, defendant did not engage in any conduct that would rise to the level of a voluntary undertaking–nothing he did can be analogized to operating a train. In other words, defendant did not render aid negligently; he rendered no aid at all. This constitutes nonfeasance. *Bourgonje*, 362 Ill. App. 3d at 996. As such, plaintiff was required to show reliance. *Id.* at 997. As there is nothing in the record that would allow plaintiff to make such a showing, this provides an alternate basis for affirming the trial court.

¶ 39     In conclusion, no issue of material fact exists as to whether defendant engaged in a voluntary undertaking such that he owed Kyle a duty of care. Moreover, there is also no issue of material fact regarding the question of reliance. As such, the trial court properly granted summary judgment in favor of defendant on this count.

¶ 40                                B. Civil Conspiracy

¶ 41     Plaintiff next argues that issues of material fact exist as to whether defendant was liable as a member of a civil conspiracy. A civil-conspiracy claim functions to extend liability beyond an active tortfeasor to those who have encouraged, aided, or helped plan the tortfeasor's acts. *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62 (1994) (citing William L. Prosser, Torts § 46, at 293 (4th ed. 1971)). A cause of action is viable only if a member of the conspiracy commits a tort in furtherance of it. *Id.* To succeed on such a claim, a plaintiff must prove the following elements: "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill. 2d 302, 317 (2004).

¶ 42     Plaintiff argues that two conspiracies existed–a conspiracy to purchase and use heroin and a conspiracy to negligently render care to Kyle. The former is clearly an insufficient basis to impose liability. Undoubtedly, facts exist to conclude that a conspiracy to purchase heroin existed; however, Kyle's death did not result from a tortious or unlawful act in furtherance of that conspiracy. Without citation to authority, plaintiff points to two possible types of acts that purportedly resulted in Kyle's death. First, plaintiff contends that, instead of helping Kyle, the group went to buy heroin and waited in the restaurant for the heroin to wear off before driving home. However, plaintiff identifies nothing in the record that would suggest that, had the group refrained from these actions, they would have rendered aid to Kyle instead. Quite simply, nothing indicates that these were either-or decisions (*i.e.*, we either buy heroin or call for medical assistance). Mere speculation is insufficient to avoid summary judgment. *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). That the group would have aided Kyle had it not gone to buy heroin and waited for its effects to subside is nothing but speculation. Plaintiff also contends that it is reasonable to infer that the group did not contact the police because it feared criminal liability. Again, nothing in the record substantiates such a fear (if anything, the record undermines plaintiff's argument, in that the group remained openly in public without any apparent concern about apprehension).

Moreover, while this might explain why they did not call the police, it does not explain why they did not take Kyle to a hospital–something they contemplated doing when speaking to Hoshaw, despite having just used heroin. In sum, plaintiff's contentions are speculative and unsupported by authority, and we do not find them persuasive.

¶ 43 Turning to the second purported conspiracy, plaintiff contends that the group's members were part of a "conspiracy to negligently perform a voluntary undertaking." We note here that civil conspiracy is an intentional tort. *McClure v. Owens Corning Fiberglas Co.*, 188 Ill. 2d 102, 133 (1999). Our supreme court has stated, "Accidental, inadvertent, or negligent participation in a common scheme does not amount to conspiracy." *Id.* at 133-34. The court added, "Mere knowledge of the fraudulent or illegal actions of another is also not enough to show a conspiracy." *Id.* at 134. It is essential that there be an agreement to accomplish something unlawful or something lawful by unlawful means, as well as a tortious act. *Id.* at 133.

¶ 44 Problematic here is the nature of the purported agreement. Essentially, what plaintiff is contending is that there was an agreement to care for Kyle negligently. A Kansas court has pointed out the inherent illogic of such a proposition:

" 'Since one cannot agree, expressly or tacitly, to commit a wrong about which he or she has no knowledge, in order for civil conspiracy to arise, the parties must be aware of the harm or wrongful conduct at the beginning of the combination or agreement. Thus, civil conspiracy is an intentional tort requiring a specific intent to accomplish the contemplated wrong and because negligence is, by definition, not an intentional wrong, the parties cannot engage in civil conspiracy to be negligent.' " *Shirley v. Glass*, 241 P.3d 134, 157 (Kan. Ct. App. 2010) (quoting 16 Am. Jur. 2d *Conspiracy* § 51 (2009)).

We find this reasoning persuasive. Quite simply, if there had been an agreement, it would have been to care for Kyle, not to care for him negligently. That the parties might have committed negligent acts in the course of attempting to provide care does not render the initial agreement, if it existed, tortious. Accordingly, this theory of recovery necessarily fails.

¶ 45 In sum, Kyle's death did not result from a conspiracy of which defendant was a part–namely, to use heroin (while Kyle's consumption of heroin might arguably have been part of an earlier conspiracy involving Hecox and Moors, defendant's subsequent purported acquisition of heroin with Moors and Hecox had nothing to do with Kyle). Further, there could have been no conspiracy to render care *negligently*. Hence, the trial court properly granted summary judgment regarding this claim as well.

¶ 46                                             IV. CONCLUSION

¶ 47 In light of the foregoing, the order of the circuit court of Winnebago County granting summary judgment in favor of defendant is affirmed.

¶ 48 Affirmed.