# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Shulte v. Flowers*, 2013 IL App (4th) 120132

---

| | |
|---|---|
| Appellate Court Caption | ART SHULTE and DIANE SHULTE, Plaintiffs-Appellants, v. ROGER K. FLOWERS, SR., Defendant-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-12-0132 |
| Filed | February 8, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Pursuant to a motion for reconsideration, the trial court properly vacated a judgment awarding $80,000 in damages for the increased flow of storm water from defendant's land onto plaintiffs' property and entered judgment for defendant, since plaintiffs failed to meet their burden of proving that the changes defendant made to his property placed unreasonable burdens on plaintiffs' property, especially when the flooding attributable to defendant's activities, as opposed to other contributing causes, was speculative, and the trial court's decision was not against the manifest weight of the evidence. |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 08-L-285; the Hon. Peter C. Cavanagh, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal        Feldman, Wasser, Draper & Cox, of Springfield (Howard W. Feldman, J. Randall Cox, and David P. Hennessy (argued), of counsel), for appellants.

Scott & Scott, P.C., of Springfield (Gregory A. Scott (argued) and Jason T.H. Germeraad, of counsel), for appellee.

Panel        JUSTICE APPLETON delivered the judgment of the court, with opinion. Justices Knecht and Turner concurred in the judgment and opinion.

## OPINION

¶ 1        Plaintiffs, Art Shulte and Diane Shulte, brought this action against defendant, Roger K. Flowers, Sr., alleging he had caused them damages by altering his land so as to increase the flow of surface water onto their land. At first, after hearing evidence in a bench trial, the trial court found in plaintiffs' favor, awarding them $80,000 in damages. Defendant thereafter filed a motion for reconsideration, in which he argued that the court's judgment was against the manifest weight of the evidence. The court agreed with defendant, granting the motion for reconsideration "as to all issues," vacating the judgment in plaintiffs' favor, and entering judgment in defendant's favor. Plaintiffs appeal. We find no abuse of discretion in the trial court's decision to grant defendant's motion for reconsideration. Implicit in that decision is the finding that plaintiffs failed to prove their case. That finding is not against the manifest weight of the evidence. Therefore, we affirm the trial court's judgment.

¶ 2                        I. BACKGROUND
¶ 3        In 1987, plaintiffs bought the land upon which their mobile-home park, Charter Oaks, is located. Charter Oaks has a north road and a south road, which are connected so as to form a U. Under the north road is a storm sewer. Mobile homes sit on both sides of the north road and the south road.

¶ 4        Terminal Avenue runs along the eastern boundary of Charter Oaks, and the nine acres on the other side of this avenue, directly across from Charter Oaks, were used as a junkyard for wrecked automobiles. The cars were arranged in rows, separated by brick roadways, and vegetation grew between the rows and along the fence surrounding the nine acres.

¶ 5        In 2006 or 2007, defendant bought these nine acres with the intention of making a parking lot and storage facility for his business, Flowers Sanitation Service. He removed about 350 to 400 truckloads of asphalt, concrete, rock, and vegetation from the 9 acres. Then he sold half the parcel, the east 4.5 acres, to County Materials Corporation. Thus, from a

bird's-eye view, looking from the west to the east, one would see Charter Oaks and then Terminal Avenue and then defendant's 4.5 acres and then the 4.5 acres he sold to County Materials.

¶ 6        After selling the east 4.5 acres to County Materials, defendant did further work on his remaining land. He needed a firm surface for garbage trucks, roll-off containers, and other heavy equipment, which otherwise would have left ruts and would have sunk into the ground. So, he removed an additional 6 inches of topsoil from his 4.5 acres and compacted the soil on the north 2.25 acres, where the trucks would be parked. He then covered the north 2.25 acres with smaller gravel and the south 2.25 acres with larger 3-inch gravel. The larger gravel, arranged in wind rows, was supposed to slow the runoff of water. In addition, he widened and deepened the ditch in front of his property, along Terminal Avenue, so as to allow for more water retention. With the gravel making up for the removed dirt, he kept the elevation of his property about the same except that he raised, by one foot, the ground on which he erected a 48-foot by 52-foot metal building.

¶ 7        County Materials laid gravel on its 4.5 acres and compacted the gravel. It also dug a ditch on its land, approximately three or four feet east of the boundary between its land and defendant's land. According to the testimony of Peter Devos, who is an employee of defendant, water from defendant's land does not run into the County Materials ditch, because defendant's land has a 1% slope to the west and a 3% slope to the south.

¶ 8        Charter Oaks is the lowest area on Terminal Avenue. It has always been subject to flooding because all the surrounding parcels of land drain onto it. Nevertheless, several witnesses, mostly longtime residents of Charter Oaks, testified that after defendant's alteration of his land, the flooding became considerably worse. Whereas before it might have been ankle-deep, now it was knee-deep, rolling like a river, carrying tires, tire rims, and other debris and ripping the skirting off mobile homes, until the storm sewers caught up.

¶ 9        Most witnesses testified that the flooding became worse, but that view was not unanimous. Devos saw little difference in the flooding before and after defendant's construction activities.

¶ 10      In any event, the evidence tended to show three additional factors that might have worsened the flooding. First, there was greater than average rainfall in 2008, 2009, and 2010 (the bench trial occurred in October 2011). The average annual precipitation for Springfield was 35 inches, based on data from 1971 through 2000. In 2007, the total rainfall was 32 inches. In 2008, however, it was 54 inches; in 2009, it was 53 inches; and in 2010, it was 47 inches.

¶ 11      Second, an employee of plaintiffs, James Taapken, took photographs and videos of some floods, and he testified that the video he took on May 30, 2008, showed the heaviest water coming off County Materials. Likewise, he testified that the video he took on June 22, 2010, showed water running primarily off County Materials, down Sidings Road (which abutted the southern boundary of defendant's property), and then into the ditch alongside Terminal Avenue, after which the water overflowed the ditch, spilling across Terminal Avenue and onto Charter Oaks. In another picture, according to Taapken, the straw that a flood had strewn across Charter Oaks had come from County Materials. Art Shulte admitted in his

testimony that defendant's property was not the only property contributing to the flooding.

¶ 12    Third, a civil engineer, Jay Jessen, put a video camera in the 18-inch sewer pipe that ran along the southern boundary of Charter Oaks, and he found that the pipe was obstructed by tree roots and a large chunk of concrete.

¶ 13                                    II. ANALYSIS
¶ 14                              A. Our Standard of Review
¶ 15                              1. *Plaintiffs' Contention*

¶ 16    The parties disagree on our standard of review. Plaintiffs contend that it is *de novo*. They quote *People v. $280,020 United States Currency*, 372 Ill. App. 3d 785, 791 (2007), in which the First District said: "When reviewing a motion to reconsider that was based only on the trial court's application (or purported misapplication) of existing law, as opposed to a motion to reconsider that is based on new facts or legal theories not presented in the prior proceedings, our standard of review is *de novo*." See also *Jones v. Nissan North America, Inc.*, 385 Ill. App. 3d 740, 745 (2008). But *cf. City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998) (with respect to "the legal effect of a given set of facts," the reviewing court decides whether the agency's decision is "clearly erroneous").

¶ 17    A *de novo* review is a review without any deference to the trial court's decision. *Miller v. Hecox*, 2012 IL App (2d) 110546, ¶ 29. If all the trial court did was apply the law to an uncontested set of facts, we would have no reason to defer to the trial court's decision, because the trial court is in no better position than we to apply the law. See *General Motors Corp. v. Pappas*, 242 Ill. 2d 163, 172-73 (2011). But is that all the trial court did in this case by granting defendant's motion for reconsideration: apply the law? To be sure, the court had to apply the law, including drainage law and the law of proximate cause (see *Callahan v. Rickey*, 93 Ill. App. 3d 916, 920 (1981)), but to apply the law, the court had to make findings of fact–or else there would have been nothing to which to apply the law.

¶ 18    Necessarily, defendant's motion for reconsideration urged the trial court to apply the law, but the whole point of the motion was that the court had erred in its evaluation of the evidence. For example, in paragraph 7 of his motion, defendant argued that the court's decision was "against the manifest weight of the evidence" in that "[t]he Plaintiffs failed to introduce evidence of Defendant's actions causing a change in the flow of water from the Defendant's property, and failed to show what water from Defendant's property actually entered upon or caused damage to Plaintiff's property." To decide the merits of that paragraph, the court obviously would have had to apply a number of legal principles, including the principle that the owner of higher ground incurs liability for damages proximately caused to the lower ground by an increase in the flow of surface water incidental to an unreasonable development of the higher ground (see 36 Ill. L. and Prac. *Waters* §§ 9-10 (2003)), but to apply those legal principles, the court first would have had to resolve some factual issues, such as whether plaintiffs had actually proved that defendant's development of the higher ground substantially increased the flow of water to their lower ground.

¶ 19    So, our standard of review will not be *de novo* across the board. Insomuch as this appeal requires us to explicate the content of the law, including the good-husbandry or reasonable-

development exception (*id.*), we will do so *de novo*. See *People ex rel. Director of Corrections v. Edwards*, 349 Ill. App. 3d 383, 387 (2004). But insomuch as this appeal requires us to scrutinize the trial court's findings of fact, we will do so deferentially, upholding those findings of fact unless they are against the manifest weight of the evidence. See *Callahan*, 93 Ill. App. 3d at 919; *Lindberg v. Lemenager*, 73 Ill. App. 3d 623, 626 (1979). A motion for reconsideration does not change the deferential standard of review normally applicable to a factual issue; a party cannot obtain a more favorable standard of review by filing a motion for reconsideration. *O'Shield v. Lakeside Bank*, 335 Ill. App. 3d 834, 838 (2002).

¶ 20                              2. *Defendant's Contention*

¶ 21        According to defendant, we should ask whether the trial court abused its discretion by granting his motion for reconsideration. Defendant's motion for reconsideration was, more precisely, a motion pursuant to section 2-1203(a) of the Code of Civil Procedure (735 ILCS 5/2-1203(a) (West 2010)), which provides as follows:

> "In all cases tried without a jury, any party may, within 30 days after the entry of the judgment or within any further time the court may allow within the 30 days or any extensions thereof, file a motion for rehearing, or a retrial, or modification of the judgment or to vacate the judgment or for other relief."

Among other cases, defendant cites *Regas v. Associated Radiologists, Ltd.*, 230 Ill. App. 3d 959, 967 (1992), in which the First District held: "A section 2-1203 motion invokes the sound discretion of the trial court." See also *In re Marriage of Christianson*, 89 Ill. App. 3d 167, 172 (1980); *Freeman v. Augustine's Inc.*, 46 Ill. App. 3d 230, 236 (1977).

¶ 22        "Abuse of discretion" is a versatile standard of review in that, depending on what the underlying issue is, it can lead to other standards of review. For example, if the judgment is against the manifest weight of the evidence, a trial court would abuse its discretion by denying a motion to vacate the judgment. See *In re Marriage of Charous*, 368 Ill. App. 3d 99, 108 (2006); *Agrimerica, Inc. v. Mathes*, 170 Ill. App. 3d 1025, 1031 (1988); *Buford v. Chicago Housing Authority*, 131 Ill. App. 3d 235, 250 (1985). If a motion for reconsideration requests the court to change its mind about its factual findings, we will find no abuse of discretion in the granting or denial of the motion unless the court's revised factual findings, or the factual findings to which it decided to adhere, are against the manifest weight of the evidence. See *People ex rel. City of Chicago v. Hollins*, 368 Ill. App. 3d 934, 942 (2006).

¶ 23        In ruling on a motion for reconsideration, a trial court can abuse its discretion not only by making, or adhering to, factual findings that are against the manifest weight of the evidence but also by applying the wrong legal standard (*Zavell & Associates, Inc. v. CCA Industries, Inc.*, 257 Ill. App. 3d 319, 322 (1993)) or by using the wrong legal criteria (*Paul v. Gerald Adelman & Associates, Ltd.*, 223 Ill. 2d 85, 99 (2006)). "[T]he question of whether the circuit court applied the correct legal standard is one of law, which we review *de novo*." *1350 Lake Shore Associates v. Randall*, 401 Ill. App. 3d 96, 102 (2010). Likewise, identifying the correct legal criteria is a task we perform *de novo*. See *People ex rel. Graf v. Village of Lake Bluff*, 206 Ill. 2d 541, 549 (2003) ("Since we must construe the subject

statutes to determine whether the trial court applied the correct legal criteria in the exercise of its discretion, a question of law is presented, and our review is *de novo*.").

¶ 24    Consequently, we agree with defendant that our standard of review looks for an abuse of discretion in the granting of his motion for reconsideration, but under the rubric of "abuse of discretion," we will apply other standards of review, depending on whether the underlying issue is factual or legal. If it is factual, we will give due deference to the finding of the trial court, which was "in a position superior to a court of review to observe the conduct of witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof." *Callahan*, 93 Ill. App. 3d at 919. If the underlying issue is legal, we will proceed *de novo*. *Barnes v. Michalski*, 399 Ill. App. 3d 254, 265-66 (2010).

¶ 25                    B. Legal Principles Relevant to Artificial Changes
                          in the Natural Flow of Surface Water

¶ 26    Under the civil law rule, the owner of dominant, or higher, land has an easement in servient, or lower, land to allow surface water to flow naturally off the dominant land and onto the servient land. *Dovin v. Winfield Township*, 164 Ill. App. 3d 326, 333 (1987), *overruled on other grounds by Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill. 2d 179, 206 (1989); *Mello v. Lepisto*, 77 Ill. App. 2d 399, 401 (1966). The rationale for the civil law rule is that "nature has ordained such drainage[] and it is natural justice that rights of individual owners should follow the laws of nature." *Dovin*, 164 Ill. App. 3d at 333-34. If the owner of the dominant land causes more water to flow upon the servient land than would have flowed upon it in the course of nature, or if, as a result of some act by the owner of the dominant land, water flows upon the servient land at a different time than when nature ordains, the civil law rule is inapplicable and will not save the owner of the dominant estate from liability to the owner of the servient estate for any resulting damages. See *Mellor v. Pilgrim*, 3 Ill. App. 476, 480 (1878).

¶ 27    The civil law rule was too harsh and inflexible. Because agriculture required the draining of marshy land, the supreme court developed the good-husbandry exception to the civil law rule. *Templeton v. Huss*, 57 Ill. 2d 134, 138-39 (1974); *Peck v. Herrington*, 109 Ill. 611, 619-20 (1884). The good-husbandry exception allowed the owner of the dominant land to change the natural flow of surface water upon the servient land if such change was necessary to the reasonable development of the dominant land for agricultural purposes. *Hahn v. County of Kane*, 2012 IL App (2d) 110060, ¶ 18; *Bollweg v. Richard Marker Associates, Inc.*, 353 Ill. App. 3d 560, 574 (2004); *Bossler v. Countryside Gardens, Inc.*, 44 Ill. App. 3d 423, 424 (1976).

¶ 28    Originally, as its name suggests, the good-husbandry exception applied only to agricultural land, but, eventually, in *Templeton*, 57 Ill. 2d at 141, the supreme court applied an analogous test of reasonableness to changing the flow of surface water in urban settings. The supreme court said:

         "The question which must be confronted is whether the increased flow of surface waters from the land of the defendants to that of the plaintiff, regardless of whether it was

-6-

caused by diversion from another watershed, the installation of septic tanks, the grading and paving of streets, or the construction of houses, basements and appurtenances, was beyond a range consistent with the policy of reasonableness of use which led initially to the good-husbandry exception." *Id.*

¶ 29 Hence, regardless of whether the setting is rural or urban, the test is "reasonableness of use." The Second District has held that if the dominant and servient estates are in an urban or suburban setting, "reasonableness of use" is determined by "balancing the benefit to the dominant estate against the harm done to the servient estate" (*Dovin*, 164 Ill. App. 3d at 335-36), as a court would do when evaluating any other alleged nuisance (*id.* at 335). In other words, to what extent does the change in the natural flow of surface water benefit the higher land and harm the lower land, and is this balance of harm and benefit equitable? In addressing those questions, the trier of fact may consider the following factors, which come mostly from the Restatement (Second) of Torts § 827 (1979): (1) the extent of the harm, (2) the character of the harm, (3) the social value that the law attaches to the use or enjoyment invaded, (4) the suitability of that use or enjoyment to the character of the locality, (5) the burden on the servient estate of avoiding the harm, and (6) the usefulness of the development of the dominant estate. *Dovin*, 164 Ill. App. 3d at 336.

¶ 30 C. The Difficulty of Separating Out Defendant's Construction Activities
From Other Factors That Could Have Contributed to More Severe Flooding

¶ 31 According to plaintiffs, "the evidence overwhelmingly demonstrates" that the floods they experienced before defendant's alteration of his property were less severe than the floods they experienced after the alteration. Even so, just because one event follows another, that does not mean that the first event caused, or contributed significantly to, the second event. There were years of above-average rainfall after defendant's alteration of his property. County Materials also altered its property. A drainpipe on plaintiffs' property was clogged with tree roots and a large chunk of concrete.

¶ 32 In other words, there are confounding circumstances, in addition to defendant's alteration of his property, that ultimately could have put the trial court in a state of uncertainty as to the extent to which the increased flooding was attributable to defendant's alteration of his property. Granted, it is common knowledge that removing vegetation and compacting soil lessen the ability of land to retain surface water and tend to cause the water to flow off it more rapidly, but even if defendant's alteration of his property contributed to the increased flooding of plaintiffs' land, that fact really would not resolve the question posed by the criterion of reasonableness (*id.* at 335-36): *To what extent* did defendant's alteration of his 4.5 acres contribute to the flooding, as opposed to the other contributing circumstances? Because plaintiffs' property flooded before defendant's alteration of his property, one might assume that higher than average rainfall would have made the flooding worse. We do not see how it would be possible, without expert testimony, to separate the effect of higher than average rainfall from the effect of defendant's construction activities. Similarly, because the purpose of the drainpipe on plaintiffs' land presumably was to carry water away from their land, the increased depth of the water might have been owing, at least in part, to the

-7-

lodgement of the eight-inch chunk of concrete in the drainpipe and its obstruction with tree roots. Another factor is defendant's neighbor, County Materials, which, like defendant, laid gravel on its 4.5-acre parcel and did some compacting. Taapken testified he saw more water coming off County Materials than off defendant's land.

¶ 33    Therefore, we do not find the trial court's decision to be against the manifest weight of the evidence. Plaintiffs had the burden of proving that defendant's development of his land was unreasonable in the burdens its placed on plaintiffs' land (see *id.*; *Delano v. Collins*, 49 Ill. App. 3d 791, 795 (1977)), and a reasonable trier of fact could conclude that plaintiffs failed to carry that burden. One can only speculate to what extent the flooding of plaintiffs' land was attributable to defendant's construction activities as distinct from other contributing causes. See *Callahan*, 93 Ill. App. 3d at 920 ("The issues of damages and of causation in this cause were intimately connected. The court found that the evidence was highly speculative as to the extent to which the flooding of plaintiffs' land was proximately caused by the activity of the defendants. As a result, the amount of damages attributable to the defendants' activities, be they 'lawful' or 'unlawful,' was highly speculative.").

¶ 34              D. The Cases on Which Plaintiffs Rely Are Distinguishable
¶ 35                              1. *Templeton*
¶ 36    At trial, defendant pointed out–and plaintiffs agreed–that plaintiffs' land was servient not only to defendant's land but to all the other land in the area. Plaintiffs say in their brief: "Also at trial, Defendant presented an entirely new defense complementary to that aforementioned, arguing that the water flowing across Plaintiff's [*sic*] property was coming primarily from other properties in the area rather than from Defendant's." According to plaintiffs, this "complementary" defense is unpersuasive in light of *Templeton*, 57 Ill. 2d at 141, in which "[t]he Illinois Supreme Court explained *** that the source of the water causing damage [was] irrelevant[] and the owner of a servient estate [did] not have to endure unreasonable drainage simply due to the property's servient status."

¶ 37    In *Templeton*, 57 Ill. 2d at 139-40, the defendants argued that "the owner of the dominant estate ha[d] an unlimited right to alter the surface-water drainage of his land so long as water [was] not diverted from another watershed." So, the legal issue in *Templeton* was "whether the liability of the owner or occupier of a dominant, or higher, estate for damage inflicted upon the servient, or lower, estate by increased surface-water runoff [was] limited to that caused by diversion from another watershed." *Id.* at 137. The supreme court answered no. *Id.* at 141. Regardless of whether the surface water came ultimately from the same watershed or from a different watershed, the defendants did not have an unlimited right to increase the rate or amount of surface water runoff flowing onto the plaintiff's land. *Id.* In either circumstance, the defendants were limited by "the policy of reasonableness of use." *Id.*

¶ 38    The argument that defendant makes in the present case bears no resemblance to the argument the defendants made in *Templeton*. In the present case, defendant does not argue he has an unlimited right to increase the rate or amount of runoff onto plaintiffs' land as long as he refrains from diverting another watershed. Instead, he argues that (1) plaintiffs had the burden of proving the unreasonableness of his construction activities by showing that these

activities, as distinct from other factors over which he had no control, excessively worsened the flooding on their land; and (2) a reasonable trier of fact could ultimately conclude that plaintiffs failed to carry this burden of proof.

¶ 39                                           2. *Bollweg*

¶ 40     Plaintiffs say that "[t]he facts noted by the *Bollweg* Court as persuasive are quite similar to those in the case at bar." Actually, setting aside the procedural circumstance that the plaintiff in *Bollweg* merely sought a preliminary injunction and therefore had a lighter burden than plaintiffs in the present case (see *Bollweg*, 353 Ill. App. 3d at 572), the facts in *Bollweg* differ from those in the present case in at least three significant ways.

¶ 41     First, the defendant in *Bollweg* did not dispute that the defendant's development of its land had caused a substantial increase in the flow of surface water onto the plaintiff's land. *Id.* at 571, 572. In the present case, that issue was disputed.

¶ 42     Second, in *Bollweg*, the increased flow of surface water could have come only from the defendant's land. There were no other possible culprits. See *id.* at 562-63. In the present case, the whole vicinity of Terminal Avenue drains onto plaintiffs' land, and it appears that County Materials graveled its 4.5 acres, and compacted its gravel, around the same time that defendant altered its 4.5 acres.

¶ 43     Third, in *Bollweg*, the plaintiff presented expert testimony on how much additional runoff the development of the defendant's property would cause. The plaintiff called James Koziol, a licensed public engineer, who testified that "[f]or a 100-year storm event, an additional 1.49 million gallons of water, or 4.59 acre-feet, [would] flow across [the] plaintiff's property after [the] defendant's property [was] developed. This represent[ed] a 15% increase in the volume of runoff, which," according to Koziol, "[was] typical for a development like the one defendant proposed." *Id.* at 565. In the present case, plaintiffs presented no comparable expert testimony as to how much defendant's development of his property had increased the runoff–or that it even had increased the runoff by any amount instead of decreasing it by virtue of the three-inch gravel arranged in wind rows and the deepening of the ditch along Terminal Avenue.

¶ 44                                  3. *Starcevich v. City of Farmington*

¶ 45     Plaintiffs say that *Starcevich v. City of Farmington*, 110 Ill. App. 3d 1074 (1982), "represents yet another example of a case in which the plaintiff triumphed with facts similar to those in the case at bar." Plaintiffs also say: "[T]he *Starcevich* court ruled in favor of plaintiffs that demonstrated flooding after heavy rains."

¶ 46     Actually, the only way the plaintiff in *Starcevich* "triumphed" was by obtaining a reversal of the trial court's dismissal of his complaint (except for one count, which the appellate court held to be correctly dismissed). *Id.* at 1081. There had been, as of yet, no trial. The trial court merely had granted the defendant's motion to dismiss the complaint as legally insufficient and time-barred–a ruling that the appellate court affirmed in part and reversed in part. *Id.* Because the case was still at the pleading stage, the plaintiff had "demonstrated" nothing.

The appellate court said: "[The] [p]laintiff *** *alleges* specific changes made on the dominant estate which *he alleges* constitute breaches of [the] duty [not to unreasonably increase the quantity and force of waters cast upon his land]. *If* those changes resulted in an unreasonable interference, then [the] plaintiff has, in our view, sufficiently pleaded a breach of the standard of care as required by *Templeton*." (Emphases added.) *Id.* at 1080.

¶ 47                                4. *Eisenbrandt v. Finnegan*

¶ 48        Plaintiffs say that, in *Eisenbrandt v. Finnegan*, 156 Ill. App. 3d 968 (1987), the appellate court "sided with the plaintiff that simply testified to the relative lack of the flooding for a number of years before the construction occurred." Actually, the evidence also showed that "the grading of the defendant's land resulted in the land being raised three feet." *Id.* at 973. In the present case, by contrast, defendant elevated only a 48-foot by 52-foot area of his 4.5 acres by a mere 1 foot. Also, in *Eisenbrandt*, "the trial court found that the project did not conform to the drainage plan as approved by the village." *Id.* In the present case, the record appears to contain no evidence that defendant violated a municipal drainage plan. In sum, just because the appellate court, in *Eisenbrandt*, did not find the judgment against the defendant to be contrary to the manifest weight of the evidence, it does not follow that in the present case, with its different facts, the trial court's judgment in favor of defendant is contrary to the manifest weight of the evidence or an abuse of discretion.

¶ 49                                III. CONCLUSION
¶ 50        For the foregoing reasons, we affirm the trial court's judgment.

¶ 51        Affirmed.