NOTICE
Decision filed 05/13/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230199-U

NO. 5-23-0199

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| MICHAEL S. HAMMOCK and KATHLEEN L. HAMMOCK, | ) ) ) | Appeal from the Circuit Court of Madison County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 18-CH-426 |
| ULRICH FAMILY FARMS II, LLC, and DENNIS ULRICH, | ) ) ) ) | Honorable A. Ryan Jumper, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1  *Held*: The trial court's determination that the plaintiffs altered the natural flow of water by installing a restricted landing area is not against the manifest weight of the evidence. The trial court did not improperly apply the law regarding water and drainage from a dominant property to a servient property. The order of the trial court is affirmed.

¶ 2  The plaintiffs, Michael Hammock and Kathleen Hammock, appeal from the December 21, 2022, order of the circuit court of Madison County denying their request for injunctive relief and the February 28, 2023, order of the circuit court of Madison County clarifying the December 21, 2022, order. For the following reasons, we affirm.

1

¶ 3                                I. BACKGROUND

¶ 4     This dispute involves a drainage issue between neighboring properties. The plaintiffs and the defendants each own 80 acres of land adjacent to one another. The plaintiffs' property is to the west and the defendants' property is to the east. The plaintiffs' property is the dominant estate based upon a slight grade from west to east.

¶ 5     On August 8, 2018, the plaintiffs filed a two-count complaint against the defendants, Ulrich Family Farms II, LLC (Farm) and Dennis Ulrich (Ulrich), seeking injunctive relief. Count I sought a mandatory injunction requiring the defendants to restore the natural drainage from the dominant estate to the servient estate. Alternatively, count II sought a mandatory injunction authorizing the plaintiffs to go upon the servient estate to restore the natural drainage from the dominant estate to the servient estate and for an injunction prohibiting the defendants from interfering with said restoration.

¶ 6     The complaint alleges as follows:

"5. Sometime in 2014, the Defendants, Ulrich Family Farms II, LLC and Dennis Ulrich, constructed or caused to be constructed on the Servient Estate a drainage system consisting of underground tiles. As part of this construction, the Defendants, Ulrich Family Farms II, LLC, and Dennis Ulrich, filled in the two open waterways which transected the Servient Estate into which water from the Dominant estate flowed.

6. The changes made by the Defendants, Ulrich Family Farms II, LLC and Dennis Ulrich, set forth in Paragraph 5 herein, obstruct the natural flow of water to the Servient Estate from the Dominant Estate, causing water to back up and pool on the Dominant Estate.

7. The changes made by the Defendants, Ulrich Family Farms II, LLC and Dennis Ulrich, set forth in Paragraph 5 herein constitute an unlawful obstruction of the natural flow of water from the Dominant Estate in violation of the drainage rights of the Plaintiffs."

¶ 7 In response, the defendants sought a denial of the requested injunction and asserted that the plaintiffs' drainage issues were caused by the construction of a restricted landing area (RLA). Neither plaintiffs nor defendants made a claim pursuant to adverse possession, or for a claim for a prescriptive easement, or any other acquiescence claims.

¶ 8 The matter proceeded to a bench trial that began on August 15, 2022, and concluded the following day. The plaintiffs presented testimony from Michael Hammock; Mark Abert, the farming tenant for the Hammocks; David Helgen, the person who installed drainage tile for Dennis Ulrich; and Lee Beckman, a professional engineer and land surveyor. The defendants presented testimony from Bryan Martindale, a professional engineer; Michael Hammock; and Dennis Ulrich. A deposition of Nick Burrus was also admitted into evidence, as well as numerous photographs and expert reports. The following relevant evidence was adduced at trial.

¶ 9 Michael Hammock (Hammock) received a bachelor's degree in aeronautical and astronautical engineering. He also obtained a commercial pilot's license. In 1983, Hammock purchased the property at issue because he was seeking property that was well suited for an RLA so he could fly his personal aircraft from his own property. In 1984, Hammock sought approval from the requisite governmental agencies to construct the RLA, which was granted and finalized in January 1985.

¶ 10 Hammock testified that he, with some help from his tenant at the time, constructed the RLA. Hammock stated,

"what I did is since I had two waterways running west to east, the runway runs north to south, so I had to cross those waterways. So, I covered the waterway by putting in culverts, putting a little bit of topsoil across the top of the culvert so the grass would grow, and that's what I did."

Hammock testified as follows regarding the culverts he placed:

"Q. [Plaintiff's counsel]: The culverts, how big are they?

A. The north culvert is 18 inches in diameter and approximately 90 feet across and the south culvert is 15 inches in diameter and it's 100 feet, I believe.

Q. And how did you choose that sized culvert?

A. Well, the culverts were laid in existing ditches. So, what I did—and I didn't want to change the flow of the water through those ditches. So, what I did is I took a 10[-]foot 2x4 out, laid it across the waterways—these waterways aren't huge; you'll see in some other photographs—I laid it across them and then I measured from the bottom of the 2x4 to the bottom of the ditch how deep is that. And on the south end, it was roughly 20 inches, 22 inches, so I could easily get in a 15-inch culvert in there.

And I did the same thing on the north end and had a little—the height was like two feet, so I could put in an 18-inch culvert and still have some top soil on top of the culvert and allow the water to pass through."

¶ 11     When Hammock constructed the RLA, he "put in a six-inch crown across the 70 feet of the restricted landing area." He testified that over the past 38 years the crown has been pushed down and now "you'll see a couple inches of crown across 70 feet."

4

¶ 12    Hammock built a driveway on the property in 1984 or 1985, a machine shed on the property in 1986, and a home in 1996. Hammock testified that none of the changes he made to the property changed how water drained from his property.

¶ 13    Hammock spoke to David Helgen when Helgen was designing a tile system for Ulrich. Hammock agreed that an underground tile system is considered good agricultural husbandry. Further, Hammock agreed that such underground tile systems are not designed to take surface water run-off but are designed to lower the water table.

¶ 14    Mark Abert testified that he was the current farm tenant for Hammock and had been since approximately 2009. Previously, Abert was a farm tenant, beginning in 2009, for the prior owner of the Ulrich property, and continued as a farm tenant until Ulrich purchased the property. Plaintiff's counsel asked Abert if he ever saw water pond on Hammock's property prior to 2014. Abert stated, "Not as bad as it is now." He also testified that he did not recall seeing flooding as shown in Plaintiff's Exhibit 56 prior to 2014.

¶ 15    David Helgen was called as a witness by the plaintiffs. Helgen testified that he farmed and installed drainage tile for a living. He completed a tiling job for Ulrich in 2015 to lower the water table within the field to promote root development for the crops. When creating the tile design for the Ulrich farm, Helgen would have physically traveled to the field and measured the elevation across the field. This data would then be used by a computer program to create a design for the underground tile system.

¶ 16    Helgen testified that he installed two inlet risers at the locations where it was obvious that culverts emptied into the fields. The risers were to allow some of the water to be directed into the tile system instead of flowing across the field. Helgen testified that the tile system was not designed to alter or change the surface flow of water on either Ulrich's property or Hammock's property.

5

¶ 17    Helgen testified that while he was at the Ulrich property, he had a conversation with Hammock. Helgen testified that Hammock indicated that he had "some drainage issues of some sort, especially pertaining to the grass strip that is out there."

¶ 18    Lee Robert Beckman testified that he was a professional engineer and land surveyor. He owned his own business Milano & Grunloh Engineers. Beckman testified that his firm was contacted by plaintiff's counsel to evaluate the Hammock property in relation to the natural flow of water and how it was changed based upon the construction of some facilities downstream. Beckman and other individuals from his firm evaluated the property by personally viewing it, taking measurements, completing a topographic survey, and completing a drainage analysis. A report was prepared based upon these findings and was presented as an exhibit at trial. Beckman testified that the report created by his firm determined, *inter alia*, that Ulrich's underground tile system was not big enough. However, at trial, Beckman conceded the size of the system is irrelevant to determining what is happening with the water.

¶ 19    Beckman testified that he worked on the Hammock report with Nick Burris. At the time of trial, Burris no longer worked for Milano & Grunloh Engineers as he had taken a job elsewhere. Burris was the representative from Milano & Grunloh Engineers who had been deposed earlier in the case.

¶ 20    Beckman testified that his firm did not initially calculate the capacity of the culverts because the "capacity of those culverts have no bearing on the backing up of the water." While on the stand, Beckman calculated that during a 10-year rain, which is what the Illinois Department of Transportation utilizes to calculate the appropriate size of a storm sewer, the rate of water flow at the Hammocks' northern culvert inlet would be 52.9 cubic feet per second (CFS) and the rate of flow to the southern culvert inlet would be 18.1 CFS.

¶ 21    Further questioning on this issue was as follows:

> "Q. [Defense counsel]: You mean if water was coming at 52.9 CFS to a culvert and it could only take 10 CFS—
>
> A. [Beckman]: It would simply back up on Mr. Hammock's problem, which is his own issue.
>
> Q. Exactly. I thought you just said—exactly. If there's—if 52 CFS is coming into the 18-inch culvert and he can take 10 CFS, that 40 CFS is backing up on Mr. Hammock.
>
> A. It would just go over the runway.
>
> Q. Well, maybe.
>
> A. Yes.
>
> Q. But, it certainly is not going through the pipe?
>
> A. Correct."

¶ 22    Beckman agreed that the culverts on the Hammocks' property are undersized. Beckman further testified as follows:

> "Q. [Defense counsel]: Creating a 1200-foot berm six inches high where water is going to have to flow over it on relatively flat land, that's going to have an [effect] on the flow of that water, isn't it?
>
> A. Yes, it would.
>
> Q. All right. Trying to run water through an 18-inch or 15-inch 100-foot steel culvert is not a natural condition on farmland, is it, to run under somebody's farmland onto somebody else's farmland? You don't see that, do you?
>
> A. I would say it's not natural."

7

¶ 23 Plaintiffs rested their case following Beckman's testimony. The bench trial was continued on August 16, 2022, and the defendants presented their evidence.

¶ 24 Bryan B. Martindale testified that he was a professional engineer. He has worked as a professional engineer and civil engineer involving hydrology and drainage work since 1980. Martindale was asked to examine the Hammock and Ulrich properties and provide an opinion on the drainage. Martindale prepared a report with his opinions.

¶ 25 Martindale testified that the landing strip altered the natural drainage of water from the Hammock property to the Ulrich property. The following testimony was presented:

"Q. [Defense counsel]: So there has been concern in this case, and I think that Plaintiffs, the Hammocks, have a view that when you see large water on their side of the runway, that this is somehow being caused by the berms on Mr. Ulrich's property. Do you have an opinion about that, sir?

A. [Martindale]: Well, that goes against physics. Physics, basically, is that water is running downhill from west to east on the property, and the first obstruction that it sees is the landing strip and the culverts, and that has restricted the flow from the natural condition, a much wider overland sheet flow, to a much more concentrated, much smaller area of flow, *i.e.*, the physics says the water can't fit through that smaller area; it has to back up."

¶ 26 Martindale also testified regarding the culverts being sloped more steeply than the natural grade of the land leading to the culverts. This change in slope would change the velocity of the water going through the culverts and onto the Ulrich property. Martindale testified that he observed erosion on the Ulrich property from the discharge of water from the culverts.

¶ 27    Ulrich testified that he is an accountant and a farmer. He purchased the land next to the Hammocks in 2013. In the spring of 2014, the trees were removed from the Ulrich land and farming was conducted from north to south. In 2015, an underground tile system was installed on the Ulrich property. The underground tile system was installed to lower the water table to increase crop yields. He also testified regarding erosion that was occurring on his property from water leaving the culverts on the Hammocks' property.

¶ 28    Following the conclusion of testimony, the trial court took the matter under advisement. The trial court issued its written decision on December 21, 2022. The trial court's order made the following findings of fact:

"Petitioners and Respondents each own 80 acres of land adjacent to one another in Madison County: Hammocks to the west and Ulrich to the east. Based on a slight grade from West to East the Ulrich property is the servient land. All of the land in dispute is zoned agricultural. In 1985 the Hammocks applied for and received permission from the State of Illinois to build a Restricted Landing Area (RLA) on the easternmost strip of their land adjacent to what is now the Ulrich farm. The RLA is 2420 [feet] in length from north to south and approximately 70 feet in width. Running underneath the RLA at two spots are metal culverts which channel surface water from the Hammock property to the Ulrich property. Although the culverts were created at the time the RLA was installed, the ditches that feed into the culverts can be seen on aerial maps and surveys of the two properties going back to the 1940's.

In 2015, a year after his purchase of the property, Ulrich made certain modifications to his farmland. First, ruts on his property that had been cut by the flow of water from the Hammock property following discharge from the ditches and culvert were drug and

9

levelled so that equipment could run over the previously steep banks. Second, Ulrich installed an underground tiling system under his farmland. The usual use for such a system is the lowering of the ground water level to promote root depth and consequently increase yields in Ulrich's crop. However, as part of the 2015 installation, intake inlets were also installed on the Ulrich property western edge directly across from the Hammock culvert outlets. The surrounding Ulrich property was modified to catch or funnel water to the tiling intake through berms and a catch crown which act as a backboard around the inlets.

The undisputed testimony is that during certain rain events water will pool on the Hammock property both to the east and west of the RLA with the western pooling continuous to the inlets and pond around the tiling system intake. At the time of trial the RLA had not been used since approximately 2008."

The trial court's order also contained the relevant case law considered by the trial court and the analysis of the issues presented. The trial court noted the good husbandry exception which has been recognized since the 1800s and allows a dominant property to change the flow of water for agricultural good husbandry purposes. *Peck v. Herrington*, 109 Ill. 611 (1884). The trial court also noted the modernization of this principle which results in a balancing of the harms and benefits of changing the natural flow of water. *Templeton v. Huss*, 57 Ill. 2d 134 (1974).

¶ 29    Ultimately, the trial court found that the crown of the RLA created an unnatural barrier to the flow of surface water across the Hammock property. The trial court noted that there was no testimony that the RLA had any agricultural purpose and it had previously been used for the Hammocks' recreational landing of small airplanes but had not been used for such since 2008.

¶ 30    The trial court identified the ultimate issue as "whether an unnaturally concentrated flow of water from the dominant estate has to be accepted by the servient estate in the most efficient

10

manner, (remembering that acquiescence and adverse possession are not considered) or simply has to be accepted." The trial court conducted a harm and benefit analysis and found in favor of the defendants.

¶ 31    On January 20, 2023, the plaintiffs filed a motion to clarify the order of December 21, 2022. Specifically, the plaintiffs sought clarification of the following portion of the order:

> "However, Ulrich is cautioned that should the slope and grade of any of the Ulrich improvements result in a barrier for the natural volume of sheet flow from the dominant to the servient estate, assuming the pre-RLA slope and grade from the dominant estate, then those improvements must be modified to preserve the natural sheet flow rate."

A hearing on the motion was conducted on February 28, 2023. At the hearing, the trial court explained on the record that if the RLA was removed, then Ulrich would need to modify the improvements on his land.

¶ 32    Plaintiffs filed a timely notice of appeal on March 27, 2023.

¶ 33                                II. ANALYSIS

¶ 34                           A. Natural Flow of Water

¶ 35    On appeal, the plaintiffs argue that the trial court's finding that the RLA altered the natural flow of water was against the manifest weight of the evidence. Further, the plaintiffs allege the trial court improperly considered that Ulrich's improvements were consistent with good husbandry and that the Hammock property was nonagricultural. Based on the foregoing, the plaintiffs argue the trial court erred in refusing to grant their requested injunctive relief.

¶ 36    "The standard of review in a bench trial is whether the judgment is against the manifest weight of the evidence." *Camelot, Inc. v. Burke Burns & Pinelli, Ltd.*, 2021 IL App (2d) 200208, ¶ 50. When sitting as the trier of fact in a bench trial, the trial court makes findings of fact and

11

weighs all of the evidence in reaching a conclusion. *Nokomis Quarry Co. v. Dietl*, 333 Ill. App. 3d 480, 483-84 (2002). "When a party challenges a trial court's bench-trial ruling, we defer to the trial court's factual findings unless they are contrary to the manifest weight of the evidence." *Id.* at 484. When applying this standard of review, we give great deference to the trial court's credibility determinations, and we will not substitute our judgment for that of the circuit court " 'because the fact finder is in the best position to evaluate the conduct and demeanor of the witnesses.' " *Staes & Scallan, P.C. v. Orlich*, 2012 IL App (1st) 112974, ¶ 35 (quoting *Samour, Inc. v. Board of Election Commissioners*, 224 Ill. 2d 530, 548 (2007)). "A factual finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence." *Samour*, 224 Ill. 2d at 544. The trial court's findings and judgment will not be disturbed "if there is any evidence in the record to support such findings." *Brown v. Zimmerman*, 18 Ill. 2d 94, 102 (1959).

¶ 37 In this case, the plaintiffs challenge the trial court's finding that the RLA they created altered the natural flow of water from their property to the servient property to the east. We have thoroughly reviewed the record on appeal. We note that the trial court heard testimony from each side's expert witnesses as well as lay testimony from the parties. The plaintiffs' own expert testified that the culverts installed under the RLA resulted in an unnatural flow of water, and further, that the culverts were undersized. Further, the plaintiffs' experts testified that the RLA resulted in water flow from all but four to six acres of the Hammocks' property to be directed through the culverts.

¶ 38 Accordingly, we cannot say that the trial court's finding that plaintiffs altered the natural flow of water was arbitrary, unreasonable, or not based on the evidence or that the opposite conclusion was clearly evident.

12

¶ 39    Next, we turn to the contentions that the trial court improperly applied the law regarding good husbandry, *i.e.*, that the court improperly considered the good husbandry of the defendants and the consideration of the nonagricultural nature of plaintiffs' property. We review the application of law *de novo*. *Shulte v. Flowers*, 2013 IL App (4th) 120132, ¶ 19.

¶ 40    Illinois law regarding the flow of water from one property to another as well as when alterations to the natural flow of water are permitted is well-settled. See *Hicks v. Silliman*, 93 Ill. 255 (1879), and *Peck v. Herrington*, 109 Ill. 611 (1884). The general principle is "[w]here water from one tract of land falls *naturally* upon the land of another, the owner of the lower land must suffer the water to be discharged upon his land and has no right to stop or impede the natural flow of the surface water." (Emphasis added.) *Gough v. Goble*, 2 Ill. 2d 577, 580 (1954). Additionally, the owner of the dominant property may not construct drains or ditches to create new channels for water in the servient property, unless the changes are for agricultural purposes on his own land, as may be required by good husbandry. *Peck*, 109 Ill. at 619.

¶ 41    As the development of property for reasons other than agricultural became the norm, the law adapted.

> "The question which must be confronted is whether the increased flow of surface waters from the land of the [dominant property] to that of the [servient property], regardless of whether it was caused by diversion from another watershed, the installation of septic tanks, the grading and paving of streets, or the construction of houses, basements and appurtenances, was beyond a range consistent with the policy of reasonableness of use which led initially to the good-husbandry exception." *Templeton v. Huss*, 57 Ill. 2d 134, 146 (1974).

13

Now instead of analyzing whether changes to the dominant land are required for agricultural good husbandry, a balancing of the harms and benefits is conducted to determine if the alterations are reasonable. *Swigert v. Gillespie*, 2012 IL App (4th) 120043, ¶¶ 35-36.

¶ 42 After the trial court made its determination that the Hammocks, the dominant property owners, altered the natural flow of water with the installation of the RLA, the next step of the analysis is to determine whether the Hammocks were allowed to make such an alteration. Under the former good husbandry exception, the analysis would have stopped as soon as it was determined that the Hammocks' property was used for recreation purposes rather than agricultural purposes. However, recognizing that the law changed from the strict agricultural good husbandry only exception to a reasonable use exception, the analysis continues.

¶ 43 When determining what is reasonable, in either a rural, agricultural setting or an urban setting, a balancing between the benefit to the dominant estate versus the harm to the servient estate must be considered. *Shulte*, 2013 IL App (4th) 120132, ¶ 29.

> "In other words, to what extent does the change in the natural flow of surface water benefit the higher land and harm the lower land, and is this balance of harm and benefit equitable? In addressing those questions, the trier of fact may consider the following factors ***: (1) the extent of the harm, (2) the character of the harm, (3) the social value that the law attaches to the use or enjoyment invaded, (4) the suitability of that use or enjoyment to the character of the locality, (5) the burden on the servient estate of avoiding the harm, and (6) the usefulness of the development of the dominant estate." *Id.*

¶ 44 In the present matter, the trial court applied the proper law and balanced the harms and benefits for a reasonable use analysis. As there was no error in the application of the law, the trial court's findings of facts regarding the harms and benefits would be reviewed under the manifest

14

weight of evidence standard. The plaintiffs did not challenge these findings in their brief; however, if they had, the trial court's balancing of the harms and benefits between the properties under the reasonable use test was not against the manifest weight of the evidence. Accordingly, the trial court correctly denied the requested injunctive relief.

¶ 45                                    III. CONCLUSION

¶ 46    For the foregoing reasons, we affirm the December 21, 2022, order of the circuit court of Madison County.


¶ 47    Affirmed.